**DISTRICT OF COLUMBIA,**
**et al., Petitioners,**

v.

**ORGANIZATION FOR ENVIRONMEN-**
**TAL GROWTH, INC., Respondent.**

No. 93–AA–1600.

District of Columbia Court of Appeals.

Argued Sept. 19, 1995.
Decided Aug. 28, 1997.

---

James C. McKay, Jr., Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel at the time

the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for petitioners.

Elaine M. Deering, for respondent.

Before TERRY, STEADMAN and FARRELL,* Associate Judges.

TERRY, Associate Judge:

This case arises from a dispute between the Organization for Environmental Growth ("OFEGRO") and the District of Columbia following the termination of a contract relating to downtown street and traffic planning. The contract was terminated by the District's contracting officer for the convenience of the District on June 10, 1986. On June 30 OFEGRO filed a claim for $253,899 with the contracting officer for monies due under the contract; on August 8 he determined that OFEGRO was due only $10,197. OFEGRO appealed to the Director of the Department of Public Works ("DPW"), and on March 15, 1990, the Director granted in part and denied in part OFEGRO's claim for an equitable adjustment and its challenge to the termination of its contract for the convenience of the District. Unsatisfied with this decision, OFEGRO appealed to the Contract Appeals Board ("CAB" or "the Board"), which ruled substantially in its favor on August 11, 1993, awarding it $575,223 in lost profits and other damages.

The District seeks review of that decision, contending that it was flawed in three fundamental respects. First, the District claims that the Board's calculation of termination costs, including its award of so-called "common law" damages, was based on an erroneous understanding of the law and, in any event, was not supported by substantial evidence. Second, the District maintains that the Board's equitable adjustment, especially its use of the "jury verdict" method, was arbitrary and capricious and was also not supported by substantial evidence. Third, the District asserts that the Board's award of

interest on the sums owed to OFEGRO exceeded the amount authorized by statute.

Finding merit, in whole or in part, in each of the District's arguments, we reverse the Board's decision and remand this case to the Board. Though OFEGRO now admits error in the calculation of its termination costs, that admission does not go far enough. We conclude that the Board's award of common law damages, which nullified the protection afforded to the District by the termination for convenience clause, is based on faulty legal analysis. Specifically, the Board's finding that the District failed to prove sufficient "changed circumstances" to justify its termination of OFEGRO's contract and its conclusion that the District's bad faith barred its invocation of the termination for convenience clause are without substantial support in either the law or the record. While, again, OFEGRO admits error in the Board's calculation of equitable adjustments, we hold that the Board's award of equitable adjustments generally was contrary to the evidence and contrary to the contractual provisions it was called upon to enforce, and that its use of the "jury verdict" method for calculating the sums allegedly owed was unnecessary, and therefore arbitrary and capricious. Finally, since the Board seems to have ignored the District of Columbia's statutorily mandated interest rate in this case, we remand for a recalculation of the interest due on the adjusted sums owed to OFEGRO.

## I. BACKGROUND

The controversy between OFEGRO and the District of Columbia had its genesis more than a dozen years ago. Concerned about the impact of a major economic revitalization of the city's downtown area, the District of Columbia allocated a portion of its Federal Highway Trust Fund money for a certified minority consultant[1] to conduct what would be known as the Downtown Street Network Study ("DTSNS").[2] In its January 3, 1984,

---

* Associate Judge Ferren was a member of the panel that heard oral argument. Thereafter he recused himself from the case, and Judge Farrell was chosen by lot to replace him.

1. The specific sums authorized here were earmarked for the promotion of minority business enterprises under 49 C.F.R. Part 23.

2. The comprehensive study would encompass most of the downtown area between the Capitol

request for proposals ("RFP"), the District stated that it sought a study which would focus on "creating a more efficient and more attractive public space environment for the Downtown ... with particular emphasis, through the development of more detailed plans, on the streets in the core area." OFEGRO, a minority-owned and -managed architectural planning firm whose president, Edward M. Johnson, held a bachelor's degree in architecture and a master's degree in urban planning, was one of seven consulting firms that submitted proposals in response to this RFP. On May 25, 1984, OFEGRO was informed that it had been selected to conduct the study.

Despite the District's selection of OFEGRO as the contractor for the DTSNS, city officials delayed signing a formal contract with OFEGRO for more than a year. Several factors contributed to this delay. First, the District was concerned that OFEGRO did not have a transportation specialist on its team—a necessary element, considering that a substantial part of the contract involved an analysis of traffic flow through the downtown area. The evidence in the record also shows that a reorganization of the District government which merged the Department of Transportation, the Department of Environmental Services, and other agencies into the Department of Public Works had the effect of blurring lines of authority and sowing confusion among District employees, some of whom did not know their proper role in the consolidated agency. This confusion frustrated attempts to reach a consensus on the precise scope of the project.

The District's internal confusion was exacerbated by efforts in the private sector to achieve the same downtown revitalization goals that were sought by government officials. The Downtown Partnership ("DTP"), a tax-exempt organization created in 1984 by private businessmen, landlords, tenants, and developers who feared competition from the

suburbs for office tenants, met regularly to discuss common development schemes and began to press the District government for swift action on implementing their own program to renovate the downtown retail core. In June 1985 Oliver T. Carr, a major real estate developer and the co-chairman of DTP,[3] and C. Bernard Gilpin, Administrator of the District of Columbia's Office of Policy and Planning ("OP"), agreed to a joint public-private effort, which would include the District government, the Pennsylvania Avenue Development Corporation ("PADC"), and DTP, to coordinate development proposals and serve as a catalyst for downtown revitalization. This new endeavor would be focused primarily on the retail core along F and G Streets—a part of the city to be covered by the OFEGRO study. Through this joint effort with the private sector, the District sought to reach a consensus on a development scheme with sufficient speed to influence office building construction already under way. To this end, District officials had OFEGRO representatives accompany them to meetings with DTP, despite the lack of a formal agreement governing the scope of the DTSNS project.

Two months after the Carr–Gilpin agreement to coordinate efforts with DTP, the District and OFEGRO reached a final agreement on the scope of the work that OFEGRO would undertake as part of the downtown study. The District's concerns about the traffic aspect of the study were alleviated when OFEGRO agreed to add John F. Callow & Associates ("Callow") and Ewell Finley & Associates as subcontractors. Their job, among other responsibilities, was to make recommendations on traffic flow through the downtown area. On August 8, 1985, the District and OFEGRO signed a contract for a fixed fee of $293,075.06, which included the costs of services provided by OFEGRO as well as Callow, the traffic subcontractor.[4] From that contract this litigation flows.

and the White House. The area was bounded on the north by Massachusetts Avenue, N.W., on the west by 15th Street, N.W., on the south by Pennsylvania Avenue and Louisiana Avenue, N.W., and on the east by North Capitol Street, N.W.

3. Curtis McClinton, Jr., the District's Deputy Mayor for Economic Development, was the other co-chairman.

4. Article I, Section 2 of the contract specifically stated, "[I]t shall be understood that there will be

The contract between OFEGRO and the District contained significant flaws and ambiguities. Article III of the contract called for the completion of the entire study within twelve calendar months, beginning on the date that OFEGRO received an official "notice to proceed"[5] from the contracting officer. Article III also included a table headed "Time for Completion," which listed six separate "tasks," subdivided by "activities," and segmented their time of performance as follows:

| Task | Work Element | Completion Schedule |
|------|-------------|--------------------|
| I. | Data Organization and Display | 2 months |
| II. | Data Analysis | 4 months |
| III. | Development of Concept Plans [6] | 7 months |
| IV. | Evaluation of Concept Plans | 9 months |
| V. | Development of Street Plans [7] | 12 months |
| VI. | Signage Study | 12 months |

Conspicuously absent from this timetable is any mention of a particular order of performance; *i.e.*, there was no specified sequence in which the tasks were to be completed. Considering the fixed twelve-month time limit for performance, the contract logically, yet somewhat irrationally, called for OFEGRO to perform all six tasks *simultaneously*. This meant that during the four-month period in which OFEGRO was to collect and analyze data about the evolution of downtown development, it was also supposed to be four months into the development of its street plans, but without the benefit of the data it was to have spent four months collecting.[8]

The simultaneous performance obligations notwithstanding, the contract placed significant other burdens on OFEGRO's rather limited personnel resources.[9] For example, in addition to the six substantive tasks required for the DTSNS, Article I, Section 4 of the contract called for OFEGRO to conduct an environmental assessment of sufficient thoroughness to provide the basis for either a Federal Highway Administration "Finding of No Significant Impact" or a decision to prepare an environmental impact statement.[10]

no privity of contract between the District and said subcontractors."

5. There is no "notice to proceed" in the record. Ordinarily, the absence of a notice to proceed is treated as a constructive suspension of the contract. *Hill Bros. Construction Co.*, ENG BCA No. 5686, 90–3 BCA ¶ 23,276, 1990 WL 131164. In this case, however, both sides began performing their obligations as if a notice to proceed had been issued on or about July 22, 1985—OFEGRO by billing the District for services performed beginning on July 22, and the District by accepting and paying invoices from that date and by sending to OFEGRO important information needed for the completion of Task I. Several documents in the record indicate, in one way or another, that July 22 was the actual starting date. Thus, for the purposes of this controversy, we will accept July 22, 1985, as the date on which the notice to proceed was issued.

6. Activity 3.2 of Task III required OFEGRO to "work with DPW and the two advisory groups (the technical and public advisory groups)." To achieve this purpose, "[u]p to four meetings per month will be held with DPW and the technical and public advisory groups."

Activity 3.4 stated that "[t]he streets 8th, F, and G, within the boundaries of the project area, will be used as representative special streets for those in the Downtown study area." This section went on to state that "OFEGRO will develop up to four design concepts ... [including] the retail core (F and G Streets between 10th and 15th Streets)."

7. Activity 5.1 of Task V called upon OFEGRO to develop special street plans for, among other locations, "the retail core (F and G Streets, between 9th and 15th Streets, N.W.)."

8. Contrary to the express terms of the performance schedule, the payment schedule (Article IV, Section 1) assumes a sequential progression through the contractual obligations—*i.e.*, payment for each task would be made when that task was completed—so that the entire sum of $293,075.06 would be paid upon the completion of Task VI.

9. Edward Johnson, the president of OFEGRO, testified before the Board that he did not designate a full-time project manager for the project, but assigned only seven staff members to work on the project on a part-time basis. Despite his administrative responsibilities as the president of the company, Mr. Johnson assigned himself the central role of urban planner/urban designer.

10. The environmental assessment was to include:

(1) a description of the project and need for action (including a discussion of the scope of the assessment, alternatives considered, potential impacts, and comments from the National Park Service, the Federal Highway Administration, the District of Columbia Department of Public Works, the National Capital Planning Commission, and the Fine Arts Commission);

(2) a statement of the impact upon physical features (including topography, vegetation disturbance/improvement, air quality, noise, water

The contract also required OFEGRO to revise this assessment "to reflect all applicable significant environmental comments received ... as a result of public hearings...."

Each of the six substantive tasks included some fairly taxing assignments. Task I alone required OFEGRO to collect and analyze a daunting amount of data.[11] Not only did OFEGRO bear the contractual obligation to collect the bulk of the information needed, but it was required to synthesize this information into "base maps and charts to display existing conditions and important land use, transportation and physical characteristics to use in preparation of preliminary planning and design concept studies." Even though the District added more than $40,000 to OFEGRO's initial bid, OFEGRO accepted this and five other equally extensive tasks for a total contract price, including anticipated profit, of $293,075.06—a sum that a federal highway official would later testify was at

least $200,000 short of the amount minimally necessary to complete the project.

The contract had a number of technical flaws as well. For example, the contract, as presented in the record, did not contain an Article II.[12] It was also deficient in that the termination clause [13] did not conform to the language of the "termination for convenience" clause required by law, namely, the Materiel Management Manual ("MMM"), which had been part of the District's government contracting regulations since 1984. *See* 31 D.C. Register 2714 (June 1, 1984); *District of Columbia v. Savoy Construction Co.,* 515 A.2d 698, 707 n. 10 (D.C.1986). Moreover, while the contract, as written, empowered the contracting officer to "postpone or abandon" work subject to the agreement (see note 13, *supra* ), it did not contain a separate and conspicuous "Suspension of Work" clause. In addition, the section of the contract governing payment contained a provi-

quality and supply, utilities including electrical equipment, gas, water and sewer lines);

(3) a statement of the impact on traffic and transportation systems (including land use, access to public transit, traffic projections, sensitivity analysis, the impact of proposed changes in street design and land use); and

(4) a statement on social and economic impact (including relationships to surrounding neighborhoods, visual/aesthetic issues, National Park Service properties and other park facilities, the need for a "4 (f)" statement, and the need for "106" clearance for historic properties).

11. *E.g.,* information pertaining to topography, population characteristics, existing land use and zoning (including retail, office, housing, and hotel market conditions), economic development, location and legislative initiatives pertaining to vending and sidewalk cafes, structural and environmental conditions, circulation and transportation, and public and private utilities.

12. On page 6 of the contract, there are sections numbered from 2 through 5 that are not included under an article. These sections delineate the responsibilities of the DPW. Consequently, the Department of Administrative Services in its decision treated these four sections collectively as "Article II" for interpretation purposes. This approach was adopted by the CAB.

13. Paragraph 12 of Attachment B of the contract reads as follows:

TERMINATION OF THE AGREEMENT: In the event the Consultant shall for any cause fail to carry out the requirements of this Agree-

ment, or fail to complete required work within the time limitation provided, *or if the Contracting Officer at any time determines that it is in the interest of the District to discontinue work or part thereof required by this Agreement, or to terminate this Agreement or any part thereof,* the Contracting Officer may, by written notice to the Consultant, terminate performance by the Consultant for any work required by this Agreement, or terminate this Agreement or any part hereof, and in any such event *the District shall pay the Consultant only such portion of the stated compensation as bears a relationship to the work performed by the Consultant. The Consultant agrees to accept the amount of compensation as so determined as full satisfaction and acquittance of all rights or claims for compensation hereunder and the same shall constitute payment in full within the meaning of this Agreement.* In the event of any termination as aforesaid, the Consultant shall deliver to the Contracting Officer, as property of the District, all designs, reports, drawings, studies, estimates, surveys, computations, computer programs, memoranda, and other papers, documents, and other material either furnished by the District or prepared by, for, or on behalf of the Consultant in accordance with any provision of this Agreement; and *the Contracting Officer reserves the right either to postpone or abandon further work of the type described in this Agreement* or to cause such work to be continued or completed in such manner, by such person or persons, and under such terms and agreements as the Contracting Officer may deem to be to the advantage of the District. [Emphasis added.]

sion that would later prove problematic to OFEGRO:

> Progress payments will be made monthly as the work progresses; the amounts of the progress payments will be based on percent of completion of each task *as determined by the Contracting Officer after review of evidence of performance submitted by the Consultant.* Payment will be made only upon approval of work advancement as determined by the District. [Emphasis added.]

Despite this language, the contract contained no clear standards for ascertaining the extent to which each task had been completed. By agreeing to this provision, OFEGRO left itself vulnerable to the subjective determinations of the contracting officer.

OFEGRO became suspicious of the District early in their relationship. The lengthy contract negotiations aroused bad feelings in OFEGRO officials toward the officials in the District government with authority to negotiate the terms of the contract. OFEGRO characterized the prolonged negotiations as "deceptive" and accused the District of trying to smear OFEGRO's reputation by dragging it before meetings with DTP without notice or an opportunity to prepare. OFEGRO officials thought the involvement of DTP to be so pervasive as to constitute "secret control" of its contract by an outside group. Then, after the contract took effect, the District was so unreliable in providing necessary information and materials for completion of the study—*e.g.,* up-to-date street maps, architectural plans and blueprints—that OFEGRO suspected the District was actually trying to undermine its ability to perform so that it could rescind the contract and award it to another contractor.

For their part, District officials began to feel discomfort about having what they came to regard as an inexperienced contractor handling such a significant contract at a critical time in the city's development. On November 5, 1985, a memorandum circulated in the Office of Policy and Planning that was highly critical of OFEGRO's efforts. In discussing a recent presentation given by OFEGRO on its progress to date, the memo stated:

There was no organizing principle to the presentation. The slide show was long, unfocused, and included a number of poor slides. It was difficult to understand what points were being made.... It did not seem as if the consultant understood the nature of the study, the relationship between urban design, public space design, transportation and the Department's objectives. The transportation information was conveyed separately and was not well related to the design presentation.... The firm's presentation displayed a lack of awareness about Downtown planning, public space and transportation issues, recent accomplishments (including the Department's) and key actors.

Dissatisfaction with OFEGRO became more public when John Touchstone, the Director of DPW, received a letter dated December 17, 1985, signed by Oliver Carr and Deputy Mayor Curtis McClinton, the co-chairmen of DTP. Writing on behalf of the DTP members who had attended a December 12 progress briefing by OFEGRO, Carr and McClinton stated that the members "were very concerned about the lack of focus reflected in [OFEGRO's] presentation." They said that "[i]n order to get consensus regarding the eventual design recommendations, we need a clear and concise distillation of the major issues and problems with the existing streetscape." The letter went on to remind Mr. Touchstone of the city's agreement to bring the relevant parties together for the specific purpose of focusing on F and G Streets, stating that DTP "would be glad to convene the relevant retailers, property owners, developers, users, city officials and PADC staff to help hammer out agreement on issues and designs."

On December 19, 1985, Patricia Fairbairn, the District's first project manager for the DTSNS, wrote a memorandum describing a meeting held the previous day with OFEGRO's project manager, Frank Thomas. She complained that "[t]he consultants seemed to have a difficult time trying to focus on the design of F Street.... Staff were concerned that this inability to focus was result-

ing in wheel spinning and wasted efforts." [14] The memorandum noted that "[k]ey elements of information still need to be brought together" and that "[m]ost of this information is specifically cited in the Scope of Work and includes pedestrian counts at major activity generators, stores, bus stops, Metrorail entrances, observed conflict points between pedestrian and vehicular behavior, access points for both pedestrians and vehicles, curb use." Ms. Fairbairn expressed her fear that "the consultants appear to be looking only at the sidewalk. The design analysis should include looking at building elevations, entry points, topography, street perspectives and vistas." She concluded her memo with the statement, "I told Frank Thomas that I thought they still had a lot of work to do, considering the study has been going on for five months."

The relationship between OFEGRO and the District continued to deteriorate in the new year. After OFEGRO made presentations to several members of DTP in January 1986, including the PADC and the DTSNS Advisory Committee, the entire DTP membership in attendance at a DTP workshop on February 19 unleashed a torrent of criticism targeted at OFEGRO. According to OFEGRO's notes of the meeting, the attendees "began, in succession, to criticize the lack of time spent by [OFEGRO] in making the presentation."

On March 3, 1986, Edward Johnson wrote to Bernard Gilpin to complain that "the changes to the sequence of our performance [are] creating serious adverse conditions for OFEGRO." He protested the District's insistence that OFEGRO representatives accompany District officials to meetings with DTP and requested an additional $32,580 to compensate OFEGRO for fifteen meetings attended by OFEGRO personnel that were allegedly outside the scope of its contract with the District. On March 26 Johnson sent another letter to Gilpin that repeated the

request for $32,580 for the additional meetings,[15] and added a request for an additional $29,360 for work on the F and G Street retail core which he claimed was also outside the scope of the contract.

On March 27 Arthur F. Duncan, the District's new project manager for the DTSNS, and Wallace J. Cohen, the Deputy Administrator of DPW, sent a letter to OFEGRO detailing their dissatisfaction with OFEGRO's work. The letter expressed disappointment with the quality of OFEGRO's efforts on a variety of levels, calling attention to the fact that "the documents and materials submitted suggest a general lack of coherent organization, data analysis, and product quality after seven months into the study." The letter went on to list specific areas within each of the six tasks where improved performance was needed. After consultations with Duncan, Cohen, and others at the OP responsible for oversight of the DTSNS, Horace Jones, the DPW contracting officer with authority over the OFEGRO contract, sent a letter dated April 21 to Edward Johnson, the president of OFEGRO, informing him that the DTSNS had been suspended to allow the District an opportunity to review the study's scope and services.

In a memorandum to OP Administrator Bernard Gilpin, dated May 1, in response to Johnson's March 3 and March 26 requests for additional payment, project manager Arthur Duncan stated that OFEGRO had misinterpreted the terms of the contract regarding its obligation to attend meetings. He said that the public and technical group meetings called for in Task III, Activity 3.2, were substantially different from meetings that OFEGRO representatives would have with District officials to collect data under Task I and for general contract administration purposes. "The purpose of the advisory committee meetings and public presentations" Duncan wrote, "has always been for OFEGRO to present the current status of

---

14. This lack of progress may have seemed puzzling because on November 4, 1985, in a monthly progress report, OFEGRO had notified DPW that it had begun work on the F and G Street core and was experiencing "no major problems."

15. Johnson wrote that "[m]eetings are not mentioned in the contract scope until page 13 (of the contract) under Task III." He pointed out, however, that "OFEGRO has been attending meetings since Task I. Only four meetings per month are required under the terms of our contract as identified in Task III."

the study ... and to encourage vigorous debate on the study's findings and recommendations." In this same memorandum, Duncan complained of OFEGRO's performance at these presentations, recalling that "[o]n several occasions OFEGRO has presented inaccurate maps and data—without DPW review, has failed to incorporate comments into study products and analysis, shown up over an hour late for a crucial meeting with the Deputy Mayor for Economic Development, and has demonstrated a general lack of consultant team coordination in public presentations." Duncan identified nine meetings listed in OFEGRO's March 26 letter that fell under Activity 3.2. While claiming that "[t]here is simply no justification for adjusting the contract by $32,580 for the additional meetings as claimed by OFEGRO, since nine public meetings over seven months are well within the range established in the contract's scope," he acknowledged that the December 12, 1985, meeting with DTP and the contentious February 19, 1986, DTP workshop "*could* be determined as out of sequence in the study" (emphasis added). Duncan suggested that the District compensate OFEGRO for these meetings as an offer of settlement, despite his misgivings about the accuracy of the time commitment that OFEGRO claimed. However, he reiterated that "these meetings were held for OFEGRO to present existing and current work progress, *not to prepare additional materials for presentation*" (emphasis added).

Although the District had long kept a public silence on the quality of OFEGRO's work, that silence ended in another contentious meeting of DTP on May 6, 1986. City Administrator Thomas Downs announced to the DTP membership that OFEGRO was faltering on the DTSNS and needed assistance. After OFEGRO ally Calvin Rolark asked why OFEGRO's contract had been suspend-

ed, an angry exchange took place between Downs and Johnson. The next day, May 7, Oliver Carr met with Edward Johnson and offered to help OFEGRO identify the resources it needed to meet its contractual obligations. Johnson, however, turned down Carr's offer of help and followed this oral rejection with a letter dated May 13, 1986, that placed responsibility for OFEGRO's performance difficulties squarely and entirely on DPW.

Following Arthur Duncan's May 1 recommendation, the OP requested, and contracting officer Horace Jones authorized, an additional payment of $3,760 to OFEGRO for the December 12, 1985, meeting and $5,858 for the February 19, 1986, workshop, both of which were "out of sequence." Jones' May 22 letter to OFEGRO restated Duncan's assessment, on behalf of DPW, that the contractually obligated "meetings" under Task III "refer to public meetings and presentations designed to seek advice from public and technical groups concerned with downtown planning and development." He denied compensation for meetings listed by OFEGRO that were "for the purpose of data collection and study coordination ... [which were] normal consultant data gathering and coordinating activities that were or should have been performed in the initial phases of the study [and] ... meetings ... for contract administration purposes...." Jones offered $9,618 to compensate OFEGRO for the "out of sequence" meetings of December 12, 1985, and February 19, 1986.

The contentious relationship between OFEGRO and the District finally came to an end when the contract was permanently terminated by Jones in a letter to Johnson dated June 10, 1986.[16] Eight days later, on June 18, OFEGRO representatives met with District officials to determine how much was

---

16. Jones' letter read in part:

In my letter dated April 21, 1986, the Department of Public Works suspended all work on the Downtown Street Network Study effective April 25th. The purpose of the suspension was to allow an opportunity to reevaluate the study's scope. This review has concluded that conditions in Downtown have changed since the original study was developed, and that the focus and scope of the Department's efforts

should change to respond to new initiatives in Downtown.

Therefore, in accordance with the general provisions of the contract DT–8521, I am exercising the authority of the Contracting Officer for the Department of Public Works and terminating all work on this study effective close of business, June 11, 1986, at the convenience of the government of the District of Columbia.

still owed under the contract. Edward Johnson demanded payment of $167,776 beyond the $127,273 that had already been paid to compensate OFEGRO for its acceleration of work and its attendance at unscheduled meetings. On June 30 OFEGRO presented DPW with an amended claim for $253,899.95.

## II. PROCEDURAL HISTORY

1. *Department of Public Works.* In response to OFEGRO's June 18 and June 30 claims, Horace Jones conducted a formal review of the sums allegedly owed.[17] In a letter dated August 8, 1986, Jones notified OFEGRO that he had determined that OFEGRO was due a total of $10,197.51, of which $9,618.00 was "compensation for expediting the retail core planning,"[18] and $579.51 was payment for products and services received after the contract had been terminated.

Although the record does not reveal what prompted his action, John Touchstone, the Director of DPW, made a separate review of OFEGRO's claims. In a finding dated October 2, 1986, Mr. Touchstone affirmed the conclusions of Mr. Jones and authorized a payment of $9,618.00 to OFEGRO to cover the two meetings with DTP on December 12, 1985, and February 19, 1986. No mention was made of the additional $579.51 which Mr. Jones had approved.

2. *Department of Administrative Services.* After the Contract Appeals Board declined, initially, to hear OFEGRO's appeal from the Director's decision, OFEGRO filed an appeal with the Department of Administrative Services ("DAS") on July 5, 1989. *See* D.C.Code § 1–1188.5 (1992). Acting on authority granted by regulation, the DAS ordered the parties to mediation on August 2, 1989, and representatives of OFEGRO and the DPW met with a mediator on August 24. Despite a subsequent mediation order on February 27, 1990, the parties were unable to reach agreement. The matter then went back to the DAS.

Before the DAS, OFEGRO made six claims. First, OFEGRO asserted that it was entitled to compensation for a "constructive change" to the contract that resulted from the delay in executing the DTSNS after it was selected as the contractor. Second, it sought compensation for a constructive change of the contract resulting from the District's failure to provide information necessary for it to perform its contractual obligations. Third, OFEGRO requested compensation for additional meetings which its representatives were allegedly forced to attend. Fourth, it maintained that the District had breached the contract by failing to provide the time-lapse camera equipment needed for its traffic study. Fifth, OFEGRO sought an equitable adjustment for out-of-sequence work. Sixth, it argued that DPW's termination for convenience was improper and unlawful.

With regard to the first claim, DAS ruled that OFEGRO could not recover for "constructive changes" made before the contract was actually executed. On the second claim, DAS ruled that although OFEGRO bore a significant contractual burden to gather needed information, DPW effected a constructive change to the contract by failing to provide "readily available" information as required by Article II, Section 4 (see note 12, *supra*) as well as traffic data necessary to complete the traffic study.[19] As to the third

17. Attachment B–8 to the contract reads as follows: "If a dispute arises relating to the contract, the Contractor may submit a claim to the Contracting Officer, who shall issue a written decision on the dispute." By law, section 2642.-C.7 of the 1985 version of the MMM controls dispute resolution between OFEGRO and DPW; this provision, however, says essentially the same thing as Attachment B–8.

18. This was an unfortunate choice of words. The more lengthy explanation for this payment in the official change order stated that the $9,618 in additional compensation was intended to pay OFEGRO for "expediting plans for the retail core, F and G Streets ... [because] consultant was required to make presentations for extra meetings with other public downtown groups in addition to the two established advisory committees." Thus, rather than compensation for expediting the work, the $9,618 was authorized as payment to OFEGRO for attending out-of-sequence meetings.

19. The DAS also held, however, that "OFEGRO must show a direct and causal connection of DPW's failure to any increases in OFEGRO's costs" and then ruled that "OFEGRO has not produced or identified such records." It therefore denied this request for compensation. Simi-

claim, DAS agreed that OFEGRO personnel were required to attend extra meetings and that OFEGRO could recover costs actually incurred. On the fourth claim, DAS found that OFEGRO had failed to show that DPW had refused to provide the critical equipment as alleged. With respect to the fifth claim, DAS ruled that DPW had accelerated the contract performance, entitling OFEGRO to equitable adjustments "to the extent that OFEGRO can establish that increases in its costs for extra work and disruption were directly attributable to the directive to expedite plans for the retail core. . . ." On the sixth claim, DAS ruled that as to the termination for convenience, the record showed "that DPW acted reasonably under the circumstances" and denied recovery.

3. *Contract Appeals Board.* OFEGRO appealed from the DAS decision to the District of Columbia Contract Appeals Board. *See* D.C.Code § 1–1189.3(2) (1992) (authorizing de novo review by the Board of a final decision by the Director of DAS). After an extensive review and an evidentiary hearing, the Board rejected the findings of the DPW and the substance of the DAS findings and awarded OFEGRO $575,223.18—nearly twice the amount that would have been paid to OFEGRO if the contract had been fully performed, and three times the outstanding balance on the account as of the date of termination. The Board fixed this amount after debiting OFEGRO's account for the $127,-273.49 that the District had already paid, and then adding termination costs of $362,493.73, including $302,523.62 for labor, $53,058.78 for subcontractors, and $6,910.93 for "deliverables"; equitable adjustments of $9,766.33 for attending additional meetings and $17,000.00 for acceleration of the contract; $20,864.33 for DPW's suspension of the contract; a ten percent profit of $38,335.77; interest of $252,471.04; and "other" charges of $1,565.87.

### A. *Termination Costs*

Before the Board, OFEGRO argued that the District should not be allowed to invoke the privilege of terminating its contract for the convenience of the government. The Board agreed, stating that "termination for convenience . . . is not of unlimited availability to the government and that it is not an open license to dishonor contractual relations." The Board refused to grant the District the protection that would have been provided under the termination for convenience clause on two grounds: (1) because DPW's rationale for the termination, *i.e.,* changed circumstances, was insufficient to justify the termination, and (2) because DPW had acted in bad faith in terminating the contract.

(1) *Changed Circumstances.* The Board determined that DPW was barred from invoking the termination for convenience option because it had provided inadequate justification for terminating the contract in Mr. Jones' letter of June 10, 1986. Specifically, the Board said, the statement in the letter that "conditions in Downtown have changed since the original study" was objectively false. In fact, the Board stated, "[t]he evidence of the record shows clearly . . . that the conditions in the downtown area had not changed since the inception of OFEGRO's contract." Relying on *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982), the Board ruled that the absence of changed circumstances meant that the District lacked an adequate justification for its termination for convenience.

(2) *Bad faith.* Citing *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298 (1976), the Board held that because DPW had acted in bad faith in terminating the contract with OFEGRO, it could not claim the benefits that flow from a termination for convenience. The Board pointed to seven different facts as evidence of bad faith: (1) the District attempted to justify its termination on a claim of changed circumstances that was objectively false; (2) although District officials knew that the study's focus was to be on the downtown retail core, it did not inform OFEGRO of this emphasis until OFEGRO was five months into its performance

---

larly, DAS said that OFEGRO *could recover for* DPW's failure to provide traffic data only "to the extent that OFEGRO can establish increased

costs which are directly attributable to DPW's failure. . . ."

of the contract; (3) when OFEGRO requested an equitable adjustment for compensation for a constructive change to the contract, *viz.*, the order to "accelerate" performance, the District responded by suspending the contract and denying compensation for costs already incurred by OFEGRO; (4) the evidence in the record was "undisputed that both District and DTP officials did not want OFEGRO to perform the contract, and some officials believed that appellant *could not* perform the contract" (emphasis in original); (5) the contracting officer acted with malice when he suspended the contract despite the absence of a Suspension of Work clause; (6) the evidence showed that there was "unfairness inherent in the acceleration order" by the District with regard to the retail core; and (7) after canceling its contract with OFEGRO, the District entered into an agreement with another contractor to complete a smaller study at more than five times the cost of the OFEGRO contract.

The Board determined that because the District was barred by *Torncello* from invoking the termination for convenience clause and because it acted in bad faith in terminating the contract, OFEGRO was entitled not only to the costs associated with termination, but also to what it termed "common law damages." That is, the Board said that in awarding compensation to OFEGRO, it would be guided by the principle that OFEGRO should "be put in as good a position as if it had been allowed to fully perform the contract." In calculating these "common law damages," the Board allowed OFEGRO to collect direct labor costs of $302,523.62 and reimbursement for the cost of consultant services in the amount of $53,058.78. In addition, the Board awarded OFEGRO $6,910.93 for "deliverables" even though the Board freely admitted that "there is no explanation as to what the deliverables actually encompass." The Board then added costs of $20,-864.33 associated with the suspension of the contract. On this subtotal ($383,357.66) the Board then calculated a ten percent profit of $38,335.77, bringing the total cost to the District to $421,693.43.

### B. *Equitable Adjustments*

(1) *Acceleration of Work.* The Board's opinion stated that "where a contractor was ordered to perform work originally scheduled sequentially, a constructive acceleration has occurred." Finding a constructive acceleration when OFEGRO was "required to accelerate its contractual performance and to perform work out of sequence in order to develop plans for the downtown retail core," the Board ruled that the District should bear the cost of OFEGRO's hiring additional personnel as a result of the acceleration.[20] However, despite what it called OFEGRO's "extensive records," the Board rejected OFEGRO's claimed adjustment of $29,847.16 because it could not differentiate the expenses allegedly resulting from the District's failure to provide needed information (a charge that the Board rejected) from the additional costs due to the acceleration. Moreover, while OFEGRO representatives "testified that OFEGRO ended up putting 18 people on the project as a result of the acceleration," the Board noted that "OFEGRO's list of disbursements and time sheets support only 16 people on the project (not including Edward Johnson).... The evidence shows that of these 16 people, only four were hired after the oral acceleration order was given." Because of these uncertainties, the Board said, "our review here will be on a jury verdict basis, which is followed by the courts and other contract appeals boards ... as a last resort when there is clear entitlement to costs which cannot be established precisely...." Employing this "jury verdict" method, the Board awarded

---

**20.** The only justification the Board offered for its conclusion that the District's request for OFEGRO to expedite performance with respect to the F and G Street core constituted an "acceleration" was the cross-examination of Horace Jones by OFEGRO's attorney. The pertinent part of the cross-examination reads as follows:

Q. Did you, as the Contracting Officer, do a change order? Yes or no?

A. I don't recall.

Q. Is there any question in your mind that asking OFEGRO to expedite work in the retail core was a change of the contract?

A. I don't have any doubts.

Q. It was a change?

A. Yes.

$17,000.00 to OFEGRO for the "accelerated" work.

(2) *Additional Meetings.* Before the Board, OFEGRO claimed that it should be compensated for ten meetings it attended which were outside the scope of the contract. The Board decided that OFEGRO should be compensated for eight such meetings.[21] Taking the hourly rates set out in the final cost proposal, which it said were "acceptable and unrebutted," the Board found that OFEGRO was due $14,598.48. After deducting $4,832.15 which had already been paid to OFEGRO for attending extra meetings, the Board ruled that the District owed OFEGRO an additional $9,766.33.

(3) *Suspension of Work.* The Board noted that the contract "did not contain a Suspension of Work clause ... although such a clause was required by regulation to be included in the contract. Moreover, the contracting officer did not even know that the contract did not contain a Suspension of Work Clause." By the Board's logic, the contracting officer "exercised his authority to perform an act which he legally could not take pursuant to the contract...." The Board concluded:

> In sum, the suspension of work was a sham and constituted nothing more than the District's continued submission to outside pressure to terminate appellant's performance in the most expedient manner possible without regard to the legalities involved. Consequently, we hold that the suspension was unjustified and unreasonable, and appellant should be compensated therefor.

Finding that it was reasonable for OFEGRO to maintain staff on a standby basis during the time of the suspension, the Board awarded OFEGRO $20,864.33 as compensation for the cost of four employees, labor overhead, and a 10 percent profit.

### C. *The Board's Calculation of Interest*

Finally, the Board awarded OFEGRO $252,471.04 in interest, calculated from June 30, 1986, the date on which OFEGRO presented its full claim to the contracting officer. Citing *South Carolina Public Service Authority,* ENG BCA No. 5564, 91–2 BCA ¶ 23,-760, 1991 WL 19128, as its authority, the Board calculated the simple interest due on the sums owed to OFEGRO based on what the Board termed "the applicable six-month Treasury rates" listed in the Federal Register from June 1986 "to the date of payment in accordance with [the Board's] decision."

### III. LEGAL ANALYSIS

◼ "With few exceptions, District contracting practice parallels federal government contract law." *Dano Resource Recovery, Inc. v. District of Columbia,* 620 A.2d 1346, 1351 (D.C.1993).[22] Thus "the decision of the Board on questions of fact shall be final and conclusive" unless it is arbitrary, capricious, or not supported by substantial evidence. D.C.Code § 1–1189.7 (1992). On questions of law, although the Board's decision is not final or conclusive, "we give careful consideration to [its] interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." *Fruin–Colnon Corp. v. United States,* 912 F.2d 1426, 1429 (Fed.Cir.1990), cited in *Dano Resource Recovery, supra,* 620 A.2d at 1352. We also look not only to the case law on which the Board relied but to other decisions of the United States Court of Appeals for the Federal Circuit, the former United States Court of Claims and its successors, and the various federal boards of contract appeals, "all of which have particular expertise in this area." *Id.* at 1351 (citation omitted).

◼ We observe at the outset that *G.L. Christian & Associates v. United States,* 160 Ct.Cl. 1, 11–13, 312 F.2d 418, 424, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), establishes that when procurement regulations, adopted pursuant to statutory authority, require that a contract contain a particular clause, the contract must be

---

21. The dates of those meetings were October 2, October 4, November 26, December 2, and December 12, 1985, and January 15 and February 19, 1986.

22. "Our standard of review is the same as that followed by the federal boards and courts under the Wunderlich Act, 41 U.S.C. §§ 321, 322." *Dano Resource Recovery, supra,* 620 A.2d at 1351.

read as though it contained that clause, regardless of whether the clause is actually written into the contract. *See S.J. Amoroso Construction Co. v. United States,* 26 Cl.Ct. 759 (1992), *aff'd,* 12 F.3d 1072 (Fed.Cir.1993); *SCM Corp. v. United States,* 227 Ct.Cl. 12, 645 F.2d 893 (1981).[23] Since the MMM was adopted in 1984 pursuant to statutory authority, it has had the force and effect of law. What this means is that the MMM provides notice to the world of certain necessary terms and conditions of any District government contract, so that carelessness in drafting consistent contractual terms will not excuse any failure to adhere to these publicly declared obligations. Thus, if any term of the contract between the District and OFEGRO conflicts with the MMM as it existed in 1985, we must, and will, interpret the contract by reference to the MMM, disregarding if necessary the actual contract language.

As a procedural matter, we note that this case is before this court on a petition for review filed by the District of Columbia. OFEGRO has not filed a cross-petition asserting any error by the Board. Thus OFEGRO may not challenge before this court those parts of the Board's decision that are unfavorable to OFEGRO. *Stutsman v. Kaiser Foundation Health Plan,* 546 A.2d 367, 370 (D.C.1988); *Edwards v. Woods,* 385 A.2d 780, 783 (D.C.1978).

### A. The Board's Award of Termination Costs

The Board's award of termination costs contains a patent error which must be corrected. As OFEGRO now admits:

[T]he Board inadvertently duplicated the $26,766.33 awarded to OFEGRO for equitable adjustments and changes, by also including these costs in the direct labor costs allowed of $302,523.62.... Therefore, the $26,766.33 entry appearing as a separate item identified as "Changes" under the subheading "Termination Costs" on page 52 of the Board opinion should be subtracted from the total costs of perfor-

mance of $321,186.27, for a net of $294,419.94.

OFEGRO's Post–Argument Memorandum at 5.

Correction of the Board's mathematical error, however, will not remedy the significant other defects in the Board's award of termination costs. On remand, the Board must also amend its faulty legal analysis, especially its interpretation of *Torncello v. United States* and its understanding of "bad faith."

Developed principally as a means to end the massive procurement efforts that accompanied major wars, the "termination for the convenience of the government" clause is a powerful tool available to the government when it acts as a contractee.

In no other area of contract law has one party been given such complete authority to escape from contractual obligations. This clause gives the Government the broad right to terminate without cause and limits the contractor's recovery to costs incurred, profit on work done, and costs of preparing the termination settlement proposal.

John Cibinic, Jr., & Ralph C. Nash, Jr., Administration of Government Contracts 1073–1075 (3d ed.1995) (hereafter Cibinic & Nash). This powerful provision is not balanced by a comparable right or advantage to the contractor. Indeed, commentators have concluded, after examining relevant court decisions, that there are "virtually no limitations on the Government's right to terminate." Perleman & Goodrich, *Termination for Convenience Settlements,* 10 Pub. Cont. L.J. 1, 7 (1978).

 The major impact of the termination for convenience procedure is that it relieves the government from the obligation of paying anticipated profits for unperformed work when it terminates the contractor's performance under the contract. *Dairy Sales Corp. v. United States,* 219 Ct.Cl. 431, 593 F.2d 1002 (1979). A contractor's recovery

---

**23.** The *Christian* doctrine has been said to apply particularly to clauses that express "a significant or deeply ingrained strand of public procurement policy...." *S.J. Amoroso Construction Co. v. United States,* 12 F.3d 1072, 1075 (Fed.Cir.1993).

We need not decide here just how much more broadly the *Christian* doctrine should be read, since the contract clauses at issue in this case fall well within this language from *Amoroso.*

after a termination for convenience is calculated on the basis of actual costs incurred plus a reasonable profit on those costs. In practical effect, a termination for convenience converts a fixed-price contract into a cost-reimbursement contract for the work performed up to the effective date of the termination. *Southland Mfg. Corp.*, ASBCA 16830, 75–1 BCA ¶ 10,994, 1974 WL 2026, *reconsideration denied*, BCA ¶ 11,272; *International Space Corp.*, ASBCA 13883, 70–2 BCA ¶ 8519, 1970 WL 1200. Allowable costs incurred, plus profit, will be recovered, subject to the overall limitation of the contract price [24] and the possible application of any loss adjustment provisions. The contractor's recovery is thus measured by the costs incurred rather than the value of the performance to the government.

(1) *Changed Circumstances.* The Board relied heavily on *Torncello v. United States, supra*, for the proposition that the government cannot exercise its right to terminate for convenience unless it can articulate a bona fide change of circumstances sufficient to justify the termination. *Torncello* is often cited by contractors who claim to have been victimized by the government's exercise of its termination for convenience option. But the holding of that case is one of the more frequently misunderstood holdings in government contract law. Contrary to the Board's interpretation of *Torncello*, the United States Court of Claims announced no departure from precedent in that case, taking pains to state that its holding was founded in "basic tenets of contract law...." *Torncello, supra*, 231 Ct.Cl. at 21, 681 F.2d at 757. Indeed, in the second sentence of the *Torncello* opinion, the court explained that it had been called upon to decide a narrow issue, namely, "the government's diversion of business away from a party, with whom it had executed a requirements contract, to a competing bidder on the original solicitation." *Id.*[25]

In *Torncello* the contractor entered into a contract with the Navy for twelve types of work at a San Diego housing facility. Some of the work was to be performed routinely; the rest was to be done on a "call" basis. Item 8 of the contract called for the contractor to handle all of the facility's rodent control problems at $500 per request. When the contractor received no calls under Item 8, it discovered that, after the contract had been executed, the Navy had approached one of the losing bidders and entered into an agreement with it for rodent control at a fraction of the contract price. Though the contractor sought breach of contract relief from the Armed Services Board of Contract Appeals (ASBCA), that body ruled that the government's failure to comply with its contractual obligation under Item 8 constituted not a breach of contract, but a constructive termination for convenience.

The Court of Claims refused to accept this rationale for the Navy's action. The court ruled that because the government had entered into a requirements contract with no intention of requiring anything of the contractor, it had made an illusory promise. "It is hornbook law ... that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract." *Torncello*, 231 Ct.Cl. at 42, 681 F.2d at 769. Thus, by destroying the only consideration that it had brought to the bargain, namely, its pledge to make exclusive use of the contractor's services for rodent control, the Navy committed a breach *ab initio*. The court held that, absent "some kind of change from the circumstances of the bargain or expectation of the parties," the government could not be relieved of liability for breaching its only contractual obligation through use of the termination for convenience procedure. *Id.* at 47–49, 681 F.2d at 772.[26]

---

24. *See* MMM § 2642.11.C.6.D.

25. A "requirements contract" is an agreement in which a buyer agrees to purchase what he needs or requires from a seller in exchange for the seller's promise to supply him. At common law these contracts were viewed as lacking mutuality, lacking consideration, indefinite, and illusory. They came to be accepted by the courts, however, when the exclusivity inherent in the promisee-promisor relationship was interpreted to furnish the needed legal detriment, *i.e.*, the consideration, necessary for an enforceable contract. *See* 3 WILLISTON ON CONTRACTS § 7:12 (4th ed.1992).

26. A more recent application of the principles articulated in *Torncello* may be found in *Operational Service Corp.*, ASBCA 37059, 93–3 BCA

■ We agree with the United States Court of Appeals for the Federal Circuit that *"Torncello* stands for the unremarkable proposition that when the government contracts with a party *knowing full well that it will not honor the contract,* it cannot avoid a breach claim by adverting to the convenience termination clause." *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1582 (Fed. Cir.1995) (emphasis added). Because DPW's termination letter, *supra* note 16, shows that that did not happen here, and because there is no evidence to the contrary, *"Torncello* has nothing to do with this case." *Salsbury Industries v. United States,* 905 F.2d 1518, 1521 (Fed.Cir.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991).

We therefore conclude that the District's right to terminate the contract for convenience was not contingent on its demonstrating a change in circumstances.

■ (2) *Bad Faith.* The only effective restriction on the exercise of the termination for convenience mechanism is the contracting officer's bad faith. In *Dano Resource Recovery, Inc. v. District of Columbia, supra,* 620 A.2d at 1361, this court adopted the standard for establishing bad faith articulated by the United States Court of Claims in *Kalvar Corp. v. United States, supra.* The *Kalvar* court held that a party claiming that the government acted in bad faith must present a reviewing court with "well-nigh irrefragable proof" to that effect. 211 Ct.Cl. at 195, 543 F.2d at 1301 (citation omitted). This hurdle is set high because there is a well-established "presumption that public officials act 'conscientiously in the discharge of their duties.'" *Id.* (quoting *Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959)). As *Kalvar* explained, "irrefragable proof" has been equated with "evidence of some *specific intent to injure the plaintiff"* or with actions that were "motivated alone by malice." 211 Ct.Cl. at 199, 543 F.2d at 1302 (emphasis in original; citation omitted). Such specific intent or malice has been found when there was a "conspiracy to get rid of

plaintiff," *Knotts v. United States,* 128 Ct.Cl. 489, 500, 121 F.Supp. 630, 636 (1954), or when the government conduct in question was "designedly oppressive." *Struck Construction Co. v. United States,* 96 Ct.Cl. 186, 222, 1942 WL 4411 (1942).

■ We hold that in this case the Board's finding of bad faith is not supported by substantial evidence. Though the record is replete with evidence of confusion, miscommunication, and incompetence, the testimony before the Board and the documentary exhibits failed to show any specific intent on the part of District officials to injure OFEGRO. There is no showing in the record that District officials were "motivated alone by malice" in their dealings with OFEGRO, nor is there any evidence of a conspiracy to get rid of OFEGRO as the DTSNS contractor. In fact, the opposite appears to be true: the District made efforts, arguably too many efforts, to *keep* OFEGRO as the contractor, causing delay in the redevelopment of downtown and loud complaints from those who had sought swift action. While OFEGRO may think it had to work under oppressive conditions, there is nothing in the record to suggest that those conditions were *designedly* oppressive, and hence no proof of bad faith as that concept is understood in government contract law.

In reversing the Board's finding of bad faith, we note a significant flaw in the Board's analysis. What must be demonstrated by a contractor is bad faith in the *termination* of the contract, not bad faith in the execution or performance of the contract. While the Board in its opinion gave examples of how the District was a less than ideal contractee, none of the factors cited by the Board as evidence of bad faith related to the termination of the contract. In order to prevail on its claim of bad faith, OFEGRO had to demonstrate that the District officials who made the decision to terminate the contract had conspired to injure OFEGRO *by that specific act.* Such concerted action and

¶ 26,190, 1993 WL 243152. That case involved a requirements contract for lawn mowing which the government terminated for convenience. The Armed Services Board of Contract Appeals held that the termination was improper because

the government knew at the time the contract was made that it intended to terminate the contract when either the government or a commercial contractor took over the work.

such specific intent are nowhere in evidence in this case.

As the principal basis for its determination of bad faith, the Board relied on its finding that in fact circumstances had not changed in the downtown area since the execution of the contract—or at least that the District knew or should have known that such changes were under way before it entered into the contract—so that the District's assertion of these changes as necessitating the termination was a "sham." But the record is not nearly so unequivocal as the Board found, either as to when the changes relied on by the District began to occur or as to when the District knew of those changes; on the contrary, there is evidence in the record of a dramatic increase in construction in the downtown area at just about the time the District and OFEGRO entered into the contract. Horace Jones, the DPW contracting officer, and John Callow, OFEGRO's traffic subcontractor, testified that there was a great deal of new commercial development in the downtown core from the middle of 1984 well into 1986. Jones described it as "an explosion of new construction east of 16th Street, which changed the focus of the whole Department of Public Works in the streetscape program." Patricia Fairbairn, the project manager for the downtown study, testified that the need for the study arose when the Pennsylvania Avenue Development Corporation and others announced plans for a major construction project on F Street between 12th and 13th Streets. According to Fairbairn, the District believed it could have an impact on this project if it came to an early agreement on the design concept. Although the Board concluded that the District should have been aware of these matters when it negotiated the contract, we agree with the District that at most its lack (or inadequacy) of knowledge would show inadvertence or lack of foresight, not bad faith. The record simply does not support a finding that the District's assertion of changed circumstances was a pretext for some other ulterior purpose.

The Board also appears to have based its conclusion, at least in part, on the notion that the District and DTP officials "did not want OFEGRO to perform the contract, and some officials believed that [OFEGRO] could not perform the contract." Even if this is true, it is irrelevant. Surely it is permissible for the District to rely on its growing unhappiness with a contractor's performance to justify a termination for convenience; indeed, such dissatisfaction may itself be regarded as a change in circumstances, as the District strenuously argues. *See SMS Data Products Group, Inc. v. United States,* 19 Cl.Ct. 612, 621 (1990) ("genuine concern that [the contractor] could not ... meet the contract's mandatory requirements" constitutes changed circumstances); *Embrey v. United States,* 17 Cl.Ct. 617, 625 (1989) ("Unsatisfactory performance by the contractor is further evidence of a change in the bargain and expectations of the parties"). We agree with the District that it would have been "irresponsible" for its officials to remain silent in the face of increasing evidence of misfeasance by a government contractor.

For these reasons we hold that the Board's finding of bad faith is without support in the record.

■ (3) *The Amount Awarded.* Having determined that the Board erred in nullifying the District's termination for convenience, we must remand for a recalculation of sums, if any, that are owed to OFEGRO, mindful that its recovery should be calculated according to the payment provisions appropriate for a fixed-price contract. Section 2642.11.C.6.D of the 1985 MMM, governing terminations for convenience, provides in part:

> [T]he Contractor and Contracting Officer may agree upon the whole or any part of the amount or amounts to be paid to the Contractor by reason of the total or partial termination of work pursuant to this Article ... provided, that such agreed amount or amounts, exclusive of settlement costs, *shall not exceed the total Contract price as reduced by the amount of payments otherwise made* and as further reduced by the Contract price of work not terminated. [Emphasis added.]

OFEGRO has already been paid $127,-273.49 for the work it completed on this contract. While the absolute maximum that could be paid to OFEGRO in termination

costs is $165,801.57 (the difference between the contract price and the amount already paid), the actual payment may turn out to be far less, considering the pay-as-you-go nature of the contractual relationship.[27]

## B. *The Board's Award of Equitable Adjustments*

Generally speaking, payment changes or "equitable adjustments" are appropriate in three types of situations: when the contractor assumes additional obligations under the contract, when some of the contractor's original obligations are canceled, and when new obligations are substituted for pre-existing obligations. *See* Cibinic & Nash, *supra* at 672. An adjustment is due not only on formal changes but also on constructive changes, *i.e.*, those informally ordered by the government or required by government fault despite the absence of a formal change order. *Emerson–Sack–Warner Corp.*, ASBCA No. 6004, 61–2 BCA ¶ 3248, 1961 WL 602 (1961).

In order to establish eligibility for an adjustment based on a constructive change, a contractor must demonstrate the occurrence of two events: a bona fide "change" and the issuance of an "order." A "change" is established when the actual performance goes beyond the minimum standards required by the contract. An "order" can be shown whenever a government representative, by words or deeds that go beyond mere advice, comment, suggestion, or opinion, requires the contractor to perform work which is not a necessary part of the contract. *OFEGRO*, HUD BCA Nos. 88–3410–C7, 89–4469–C7, 91–3 BCA ¶ 24,206, 1991 WL 144232.

An equitable adjustment is said to be "the difference between what it would have reasonably cost to perform the work as originally required and what it reasonably cost to perform the work as changed." *Modern Foods, Inc.*, ASBCA 2090, 57–1 BCA

¶ 1229, 1957 WL 4960; *see Jack Picoult*, VABCA 1221, 78–1 BCA ¶ 13,024, 1978 WL 2469. But a contractor who has underestimated his bid may not properly use a change order as an excuse to shift his own risks or losses to the government. *See Nager Elec. Co. v. United States*, 194 Ct.Cl. 835, 851–853, 442 F.2d 936, 945–946 (1971); *Keco Industries, Inc. v. United States*, 176 Ct.Cl. 983, 999–1002, 364 F.2d 838, 849–850 (1966), *cert. denied*, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967).

In establishing the total amount of the equitable adjustment, the party claiming entitlement to the adjustment must bear the burden of proof. *See Nager Elec. Co., supra*, 194 Ct.Cl. at 852–54, 442 F.2d at 946. The submission of actual cost data to the court or reviewing agency is the preferred method of establishing the amount of the adjustment. *American Line Builders v. United States*, 26 Cl.Ct. 1155 (1992); *Cen–Vi–Ro of Texas v. United States*, 210 Ct.Cl. 684, 538 F.2d 348 (1976).

(1) *Acceleration of Work.* We have substantial concerns about the Board's award based on the alleged acceleration of work. Under very limited circumstances, contract appeals boards employ what is known as the "jury verdict" method when faced with conflicting evidence as to the amount of compensation owed on a price adjustment. This method may be used when the board is not convinced by the contractor's evidence of the precise amount owed, yet finds that some extra costs were incurred. *Lawrence D. Krause*, AGBCA 76–118–4, 82–2 BCA ¶ 16,-129, 1982 WL 7879. It is, however, only a mechanism for reconciling conflicting testimony, not a method of proving the actual amount. *See Delco Electronics Corp. v. United States*, 17 Cl.Ct. 302, 323–324 (1989), *aff'd*, 909 F.2d 1495 (Fed.Cir.1990).

The prerequisites for using the jury verdict method were set forth by the

---

27. OFEGRO cannot be heard to complain about the amounts paid to it thus far by the District. Under the contract to which it agreed, payments were to be "based on percent of completion of each task *as determined by the Contracting Officer after review of performance submitted by the Con-* sultant." Article IV, § 2 (emphasis added). We note that section 2642.11.C.8 ("Article 8, Payments to Contractor") of the 1985 MMM also provides for payment based on the determinations of the contracting officer.

Court of Claims in *WRB Corp. v. United States*, 183 Ct.Cl. 409, 425 (1968):

> Before adopting the "jury verdict" method, the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method of computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages.

The jury verdict method is not a substitute for proving the claim by the best evidence available, whether by actual costs or by estimates, unless the contractor demonstrates a justifiable inability to produce such evidence. *Joseph Pickard's Sons Co. v. United States*, 209 Ct.Cl. 643, 532 F.2d 739 (1976). Nor can it be used if the contractor unjustifiably failed to maintain records of the additional costs caused by a change. *Dawco Construction, Inc. v. United States*, 930 F.2d 872 (Fed.Cir.1991) (claim denied because contractor had not collected cost data and had not submitted evidence sufficient to approximate the adjustment); *Engineering Technology Consultants, S.A.*, ASBCA 44912, 93–1 BCA ¶ 25,556, 1992 WL 322249, *reconsideration denied*, 93–2 BCA ¶ 25,732, 1993 WL 18922 (denying a significant portion of the claim because of contractor's failure to keep cost records); *see Roy D. Garren Corp.*, AGBCA 85–196–1, 91–1 BCA ¶ 23,306, 1990 WL 121161 (denying claim when contractor had not collected data on costs of a change even though the contracting officer had acknowledged government liability).

██ Actual cost data are particularly important in this case because the record does not clearly show that an acceleration took place. As we read the contract, particularly Activity 3.4 of Task III and Activity 5.1 of Task V (see notes 6 and 7, *supra* ), OFEGRO was under a pre-existing obligation to provide a special street plan for the F and G Streets retail core. If one accepts July 22, 1985, as the starting date for OFEGRO's performance (see note 5, *supra* ), it necessarily follows that OFEGRO had already consumed five of the seven months allocated for *all* of its Task III obligations, and five of the twelve months allocated for *all* of its Task V obligations, at the time the District allegedly

"accelerated" the contract on December 12, 1985. Even though OFEGRO had used up more than 70 percent of the time allotted for Task III, its invoice of January 9, 1986, indicates that it had only completed 20 percent of the work required (a figure which the contracting officer later reduced to 15 percent after reviewing the supporting data). This same January 9 invoice also shows that despite consuming 40 percent of the time allotted to complete all of Task V, OFEGRO had completed only 3 percent of its obligation under Task V. The record is filled with instances of District officials asking OFEGRO to "expedite" its work on the retail core. While it may be true that OFEGRO was forced to hire additional personnel and work long hours in order to fit seven months of work into a two-and-one-half month time period, and twelve months of work into a seven-month time period, we are at a loss to understand how this self-imposed compression can be deemed a compensable "acceleration."

But even if we were to accept both OFEGRO's allegation and the Board's finding that "OFEGRO's work on the F and G Streets concept design accelerated after the December 12, 1985, presentation before the DTP," we would need to consider whether the MMM, which is deemed to be part of the contract, would bar any recovery for equitable adjustments from this alleged order to accelerate. Section 2642.11.C.3.B of the 1985 MMM states:

> Any ... oral order (which term as used in this Section B shall include directions, instruction, interpretation, or determination) from the Contracting Officer, which causes any such change, shall be treated as a Change Order under this Article, *provided that the Contractor gives the Contracting Officer written notice stating the date, circumstances and sources of the order and that the Contractor regards the order as a Change Order*. [Emphasis added.]

Section 2642.11.C.3.C provides in part:

> [E]xcept for claims based on defective specifications, no claim for any change under B. above shall be allowed for any cost incurred more than 20 days before the Contractor gives written notice as therein

required unless this 20 days is extended by the Contracting Officer....

If the Contractor intends to assert a claim for an equitable adjustment under this Article, he must, *within 30 days after ... the furnishing of a written notice under (b) above,* submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim, unless this period is extended by the Contracting Officer. [Emphasis added.]

This language appears to require two acts by the contractor as a condition precedent to being compensated for work claimed to be the result of a constructive change. First, the contractor must send, within twenty days after incurring the claimed costs resulting from the alleged change, written notice to the contracting officer that the contractor regards the work in question to be outside the scope of the contract ("twenty-day notice"). Then, within thirty days after this preliminary notice, the contractor must provide to the contracting officer an accounting of the costs incurred and the nature of the work ("thirty-day accounting").

These provisions are consistent with the protections afforded to the government against contractors who seek to recover for phantom "changes." The Court of Claims described this protection in *J.A. Ross & Co. v. United States,* 126 Ct.Cl. 323, 115 F.Supp. 187 (1953). According to the *Ross* opinion, whenever the government orders work done which the contractor thinks is beyond the contract's requirements, the contractor is "required to protest against doing it, or to secure an order in writing before doing it. It is basic in all Government contracts that the [contractor] cannot do work which it is not required to do by the contract, without registering a protest against being required to do it, or securing an order for extra work, and then later make a claim against the Government for additional compensation." *Id.* at 329, 115 F.Supp. at 190; *see* CIBINIC & NASH, *supra* at 472 *et seq.*[28]

The earliest written notification in the record indicating money due for "accelerated work" is a January 9, 1986, invoice submitted by OFEGRO. On the second page of this invoice, under a column called "OFEGRO Comments," is a notation that the bill submitted "does not reflect the accelerated work schedule as requested by DPW. These costs are more accurately reflected by the money actually spent by OFEGRO in order to perform the Task and provide the service. $31,-974.88 was actually spent by OFEGRO during the December invoice billing period." By failing to state the sums it claimed to be due for the accelerated work, and by failing to give the formal written notice required by the MMM that it considered the December 12, 1985, discussion to be a change order, this notation on the second page of the invoice does not appear to have provided sufficient notice to the District to allow OFEGRO to claim an equitable adjustment. Even if one were to read the January 9 invoice as constituting the "twenty-day notice," there is nothing readily apparent in the record that would satisfy the "thirty-day accounting" requirement. The only documents that even come close are the letters of March 3 and March 26, 1986, from Mr. Johnson to DPW detailing the need for extra compensation, and they came far too late to satisfy the thirty-day time limit imposed by the MMM.

Therefore, since we are remanding this case in any event for a proper calculation of termination costs, we vacate the equitable adjustment for acceleration of work so that the Board on remand may re-examine that issue as well and address the concerns we have expressed here.

(2) *Additional Meetings.* The Board's equitable adjustment of $9,766 for attending additional meetings contains another patent mathematical error which needs to be corrected. In allocating $14,598 to OFEGRO as compensation for attending eight meetings outside of the scope of the contract, the Board reached its $9,766 figure by subtracting the $4,832 it said had already been paid by the District to OFEGRO for attending additional meetings. However, as the Board's findings of fact themselves reveal,

---

28. We recognize that more recent cases have tended to ameliorate the strict application of the *Ross* doctrine and, in particular, to require some degree of prejudice to the government. *See* CIBINIC & NASH, *supra* at 480–481.

the District had already paid $9,618 to OFEGRO. By the Board's own reasoning, therefore, the District owed only $4,980 ($14,598 minus $9,618) to OFEGRO.

### C. The Board's Calculation of Interest

The District claims that the Board's calculation of interest was wrong as a matter of law because the Board employed an adjustable rate pegged to United States Treasury rates as published in the Federal Register rather than settlement rates mandated by local law. Aside from citing *South Carolina Public Service Authority, supra,* as authority, the Board gave no justification for its award of interest indexed to Treasury rates. *South Carolina Public Service Authority* is inapposite because that case, involving the Federal Power Act and federal regulation of electrical utilities by the Federal Power Commission, dealt directly with the authority of the federal government in an area specifically preempted by federal law. OFEGRO argues that the Treasury rate is appropriate because Federal Highway Administration funds were used for the project; in the alternative, OFEGRO attempts to justify the Board's calculation under *Harrison v. District of Columbia,* 704 F.Supp. 244 (D.D.C.1988). However, as OFEGRO admits, *Harrison* was a case brought by employees of the District of Columbia government claiming overtime under the Fair Labor Standards Act and a specific federal statute concerning overtime wages, a federal mandate that pre-empted any District law to the contrary.

In the case at bar, neither the Board nor OFEGRO has made any showing that the block grant of federal highway funds was intended to override the District's statutorily mandated accounting and budgeting procedures. To the contrary, testimony before the Board by Arthur Hill, an official of the Federal Highway Administration, established that the money provided by the Highway Administration was allocated through the Highway Trust Fund, a fund into which the states make payment from taxes on gasoline, tires, and other transportation-related equipment. Other federal highway funds are provided as block grants for specific line items in the District's budget. Once approved, these sums become part of the District's budget, and a claim for payment from them would be a claim against the District government, not the federal government. Thus any interest owed should be calculated in accordance with District law, not federal law.

The applicable provision of District law is D.C.Code § 1–1188.6 (1992), which provides:

> Interest on amounts found due to a contractor on claims shall be payable at a rate set in § 28–3302(b) applicable to judgments against the District government.... [29]

Because section 28–3302(b) fixes the maximum allowable rate at four percent, we hold that four percent must be the maximum rate in this case.

### IV. CONCLUSION

We reverse the Board's award of termination costs and remand with instructions for the Board to calculate the sums due to OFEGRO, if any, that are consistent with the government's valid exercise of a termination for convenience. We reverse the Board's award of equitable adjustments and remand with instructions to recalculate the compensation due to OFEGRO for attending meetings outside the scope of its contract, taking into consideration the $9,618.00 already paid by the District. The adjustment for the alleged acceleration, if awarded at all, must also be recalculated using actual cost data. Further, the Board's analysis must differentiate between the costs incurred by OFEGRO as a consequence of catching up to its contractual obligations and those attributable to a bona fide change order. Finally, we direct the Board to recalculate the interest awarded at a rate not to exceed four percent, as required by District of Columbia law.

*Reversed and remanded.*

---

**29.** This statute was amended in 1997, but the amendment preserves this language. *See* D.C.Code § 1–1188.6 (1997 Supp.).