*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-AA-1155

RUSTLER CONSTRUCTION, INC., PETITIONER,

v.

DISTRICT OF COLUMBIA, RESPONDENT,

and

No. 17-AA-0092

DISTRICT OF COLUMBIA, PETITIONER,

v.

RUSTLER CONSTRUCTION, INC., RESPONDENT.

On Petitions for Review of an Order
of the District of Columbia Contract Appeals Board
(CAB D-1385)

(Argued April 30, 2019      Decided July 3, 2019)

*Robert A. Klimek, Jr.* for petitioner/cross-respondent.

*James C. McKay, Jr.*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Acting Solicitor General at the time the brief was filed, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for respondent/cross-petitioner.

Before FISHER, THOMPSON, and MCLEESE, *Associate Judges*.

FISHER, *Associate Judge*:  Over fifteen years ago, Rustler Construction, Inc. ("Rustler") and the District of Columbia entered into a roadway improvement contract.  A series of issues arose which prompted Rustler to seek additional compensation.  The parties cross-petition for review of an order of the District of Columbia Contract Appeals Board ("CAB") which granted Rustler $155,481.70 on its quantum claim.  Finding neither petition persuasive, we affirm the CAB's decision.

## I.  Background

In 2002, the District of Columbia and Rustler entered into a $5,217,550 contract to reconstruct a section of Bladensburg Road, N.E., in Washington, D.C. The contract was scheduled to be completed in 360 days and required Rustler to rebuild approximately three-quarters of a mile of a high-traffic six-lane highway, all while allowing four lanes of traffic to flow through the work area.  Work was broken down into five phases.  In Phase I, Rustler would remove the existing median and place temporary asphalt pavement in the area.  In Phases II and III, Rustler would replace the two outside lanes on either side of the highway.  In Phase IV, Rustler would reconstruct the inside lanes, replace the median, and

connect the lanes. In Phase V, which was later incorporated into Phase IV, Rustler would remove barriers and prepare the road for traffic.

Construction on the roadway began in spring 2003. The first major problem arose prior to the start of Phase II. The parties had agreed to maintain nine-foot, four-inch travel lanes throughout construction. However, due to the District's "miscalculat[ions]," this agreed-upon lane width could not accommodate buses. The District issued a stop-work order, halting the construction for twenty days. A revised traffic plan widened the travel lanes to ten feet for bus-restricted lanes, and to eleven feet for all other lanes. This new plan narrowed Rustler's work area by approximately six feet, eight inches.[1]

The problems with this issue became apparent towards the end of the contract. Reducing the work area impacted five Phase IV projects: (1) Rustler was unable to use a boom truck to install granite curbs as originally planned and instead needed to use a more laborious method; (2) Rustler was unable to use a concrete paving machine and was required to lay pavement by hand; (3) removing excavated material took longer than expected due to the restricted space in which

---

[1] The District compensated Rustler $177,937 for the delay between April 23, 2003, and May 13, 2003. This period of delay is not relevant to the issues presented.

Rustler was required to load the material onto its trucks; (4) Rustler could not use the equipment it had planned on using to excavate around existing manholes, and instead needed to place ramps over the manholes and to hand-grade the area around the manholes once excavation was completed; (5) Rustler was required to spend extra time cutting joint baskets to the proper length.

The second issue arose during Phase II. Part of Rustler's duties involved removing existing catch basins (storm drains) and installing new ones in their place. During excavation, Rustler discovered that the catch basins were on top of an active high-pressure gas line. Although Rustler had been aware from the start of the contract that a gas line was in the vicinity, it did not know the exact location. To remediate this problem, Rustler relocated the catch basins into the street and returned at a later time to pour concrete around the basins. According to Rustler, it took the District "a good two months" to instruct Rustler how to respond once the issue was discovered.

The third issue involved Potomac Electric Power Company ("Pepco") manholes which were located along the strip of roadway reconstructed during Phase III. The contract specifications stated that the forty-one manholes were "abandoned," so Rustler planned to pave over them. However, Rustler later

learned that the manholes were "live." In order to keep them functional, Pepco contractors were intermittently on the scene for some time. Rustler then paved around the manholes rather than over them as it had planned.

The fourth issue arose between Phases III and IV. The contract required Rustler to install a thin strip of asphalt between the new and existing roadbeds in order to allow vehicles to transition smoothly from lane to lane. While creating this roadway "tie-in," the parties discovered a several-inch discrepancy between the height of the existing roadway and the new one. The District instructed Rustler to create a wider tie-in than was originally expected. Rustler had to cut down the old roadway and install a much wider strip of asphalt between the lanes. The District compensated "Rustler for the additional work and materials under existing unit prices for the temporary asphalt," but not for additional field overhead.

## A. Rustler's Equitable Adjustment Claim

Rustler filed a claim for equitable adjustment on November 19, 2009. After the claim was deemed denied, Rustler appealed to the CAB. Rustler argued that it was entitled to an equitable adjustment of $1,227,021.37 to cover the "additional

costs in completing the work" as "a result of defective and changed specifications, differing site conditions, and other extra contractual activities."

## 1. The Entitlement Order

After a five-day hearing on the matter, the CAB issued an order determining that Rustler was entitled to an equitable adjustment for all four of its claims. Entitlement for three of Rustler's claims—the Phase IV work area reduction, Pepco manholes, and roadway tie-in—was based on defective specifications, while entitlement for the catch basin claim was due to differing site conditions.

The CAB determined that Rustler relied on the District's erroneous specifications that: (1) the traffic during Phase IV would be maintained in four nine-foot, four-inch lanes; (2) the Pepco manholes had been "abandoned"; and (3) the temporary asphalt placed during the roadway tie-in would be no more than ten inches wide. The District offered no evidence to suggest that Rustler was aware that the specifications were defective. The CAB found that the location of the high-pressure gas line was a differing site condition and, therefore, Rustler had established entitlement for the catch basin claim.

Rather than awarding damages, the CAB remanded the "matter to the parties for further negotiation."

## 2. The Quantum Order

Despite the CAB's directive that the parties negotiate, the District held firmly to its belief "that the quantum of damages that [Rustler was] entitled to [was] zero." Since the parties were unable to reach a settlement agreement, the CAB issued a quantum order which awarded Rustler an equitable adjustment of $155,481.70 plus interest. Rustler's poor record keeping created a failure of proof which greatly affected its recovery. As the CAB emphasized, Rustler did not break down its costs by task, and neither actual costs nor cost estimates were available to provide a reliable basis for calculating damages. Therefore, the CAB applied the "jury verdict" method to determine an appropriate quantum award. It calculated this value by looking at the daily rate for a full crew and multiplying that rate by the estimated number of days it took to complete each additional task. All quantum awards included an additional 20% for home office overhead and profit,

as well as 0.83% for bond costs.[2]  Notably, the CAB concluded that Rustler did not prove overall delay because it failed "to present critical path or other credible evidence on the extent of the delay to overall project completion."

## II. Analysis

## A. Rustler's Claims

The same flaw—poor record keeping—permeates all of Rustler's claims. Rustler was unable to recover under a theory of "overall delay" because it failed to submit appropriate evidence to show the extent of delay to items on the critical path.  It likewise could not justify the total number of days it requested for additional and out-of-sequence work because it did not keep records detailed enough to prove its claim.

We give great deference to the CAB's factual findings.  *See Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1175 (D.C. 2006). "[T]he decision of the [CAB] on questions of fact shall be final and conclusive and

---

[2]  The awards Rustler requested for each of its four claims included 20.26% home office overhead and 10% profit.  However, the contract established a maximum recovery of 20% for combined home office overhead and profit.

shall not be set aside unless the decision is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, or if the decision is not supported by substantial evidence." D.C. Code § 2-360.07 (2012). We review legal decisions de novo, but "we give careful consideration and great respect to [the CAB's] interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." *Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346, 1351-52 (D.C. 1993) (quoting *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed. Cir. 1990)).

For the reasons discussed below, we see no reason to overturn the CAB's determination.

## 1. Rustler's Claim of Overall Delay

To begin, the CAB did not err in determining that Rustler failed to prove overall project delay. Rustler essentially wanted to use the number of days by which completion was delayed as a proxy for extra costs incurred. But, as the CAB held, Rustler's "failure to present critical path or other credible evidence on the extent of the delay to overall project completion is fatal to its claimed project

delay even where [Rustler] may have shown that a specific construction activity was delayed."

Overall delay occurs when delay caused by the government affects projects that are on the critical path. *See George Sollitt Constr. Co. v. United States*, 64 Fed. Cl. 229, 240 (2005). The United States Court of Federal Claims has defined "the critical path" as "items of work [that] are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed." *Id*. at 240 n.9 (quoting *Haney v. United States*, 676 F.2d 584, 595 (Ct. Cl. 1982)). While there are many subprojects involved in any large contract, those that are not on the critical path "may be performed at any time within a given period without any effect on the completion of the entire project." *Id*. (internal quotation marks omitted). If the government causes a delay to the completion of items outside of the critical path, a contractor may not recover based on a theory of overall delay, although, as shown below, it may recover under a different theory of liability, such as defective specifications or differing site conditions. *See Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 433 (1993) (declining to award damages due to delay because of a failure to establish a critical path, but considering the claims under other theories of recovery). Damages for overall delay are recoverable only if the claimant proves not only that the delayed tasks were on the critical path, but

also the extent to which those delays affected completion of the overall project. *See George Sollitt*, 64 Fed. Cl. at 240. It is the contractor's burden to establish the critical path and prove that the delayed items were on that path. *See id*. Without defining the critical path, a contractor is barred from recovery for overall delay. *See id.*

The best way to establish the critical path is by presenting CPM schedules.[3] *See Appeal of Civil Constr.*, *LLC*, DCCAB No. D-1294 et al., 2013 WL 3573982, 62 D.C. Reg. 4422, 4439 (Mar. 14, 2013). As evidenced by the five change orders that were issued throughout the contract, the critical path may evolve during the course of a project. *See George Sollitt*, 64 Fed. Cl. at 240. Given the fluctuating nature of the critical path, courts have held that "accurate, informed assessments of the effect of delays upon critical path activities are possible only if up-to-date CPM schedules are faithfully maintained throughout the course of construction." *See Blinderman Constr. Co., Inc. v. United States*, 39 Fed. Cl. 529, 585 (1997). It is a well-accepted principle that contractors must modify and update the CPM schedules when issues arise during the course of construction. *See id*. Indeed,

---

[3] The acronym "CPM" stands for "critical path method," and the CAB refers to documents which contain updates to the critical path as CPM schedules.

Rustler was *required* by contract to frequently and regularly update the CPM schedules.

Yet, Rustler failed to do so. It submitted only four CPM schedules throughout the course of the contract, two of which were given to the District before construction started. The only CPM schedules that Rustler produced after construction began were insufficient to establish the effect any delay had on the critical path. Rustler submitted one CPM schedule in May 2003, after the parties resolved the Phase I issues, and the other in July 2004 which addressed Phases IV and V. Although there were other issues that altered the time frame for completing various projects, Rustler did not offer any other CPM schedules. Therefore, the CAB correctly found that Rustler did not maintain up-to-date CPM schedules and failed to delineate what items were on the critical path and what effect the District's mistakes had upon the schedule for completing those tasks. While this deficiency in record keeping may not have prevented Rustler from proving its entitlement to an equitable adjustment, we agree with the CAB that it did affect the quantum award, as it was difficult to quantify the effect the defective specifications and differing site conditions had on the critical path.

Without up-to-date CPM schedules, damages may sometimes be proven through expert testimony. *See Civil Constr*., 62 D.C. Reg. at 4400. Rustler could not establish damages for delay by this method either, as it did not present expert testimony. Instead, it primarily relied on the testimony of Karen Salehi, the company's vice president who prepared the claim. Although Ms. Salehi had a great deal of experience in managing a construction company, she "did not have a background in engineering, did not consult with anyone who had a background in scheduling, and did not confirm the number of delay days with an expert consultant." Rustler argues that her testimony was "the equivalent of expert testimony," but the CAB "specifically [did] not credit the conclusory testimony of appellant's vice president." Rustler has not demonstrated a sufficient basis to overturn the CAB's decision to discredit Ms. Salehi's uncorroborated and self-serving statements. *See Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd.*, 893 A.2d 569, 581 (D.C. 2006) (giving deference to the CAB's credibility determination).

Since Rustler could not show the extent of delay to the critical path, either by presenting updated CPM schedules or expert testimony, it could not prove that the prolonged completion of the contract amounted to overall delay. Accordingly, we agree with the CAB that Rustler was not entitled to receive damages measured

by delay or field overhead costs for any of its claims. *See Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1317-18 (Fed. Cir. 2000) (declining to award field overhead costs when contractor failed to show that government's actions affected the critical path); *see also Appeals of Tromel Constr. Corp.*, PSBCA No. 6303, 13 BCA ¶ 35, 346, 2013 WL 3227344 (June 27, 2013).

## 2. Award for Additional Tasks and Out-of-Sequence Work

Although Rustler did not establish overall delay, the CAB did award it damages for a total of 28.5 days of additional tasks and out-of-sequence work. We see no reason to disturb the CAB's quantum order. While the CAB significantly whittled down the award Rustler requested, its decision to do so was supported by substantial evidence and was not arbitrary or capricious. Rustler was unable to prove the amount of damages it claimed because it did not break down its costs by task. *See Blinderman*, 39 Fed. Cl. at 537 (stating that the contractor must prove liability, causation, and resultant injury by a preponderance of the evidence). Faced with this problem, the CAB thoroughly scrutinized the records presented in order to calculate the total award and offered a detailed justification for each of its decisions.

The CAB's award is broken down as follows:

*Phase IV Work Area Reduction Claim* — Rustler initially claimed a total of $751,158.74 for eighty-four days of work to complete additional tasks as a result of the work area reduction. It requested forty-three days for the granite curb placement, nineteen days for the concrete placement, seventeen days for the excavation operation, three days to ramp the manholes, and two days to replace the joint baskets. The CAB accepted Rustler's approximation of days required for all but two tasks. It reduced the number of days claimed for the granite curb placement to twenty based on a review of crew reports and reduced the number of days it took to excavate to sixteen days based on testimony that Rustler loaded 500 truckloads of material.

Despite accepting that Rustler was "entitled to costs it incurred" for these additional tasks, the CAB awarded Rustler compensation for only twenty days. We find no error here. The CAB explained that "the daily crew reports show that various Phase IV tasks often overlapped and were being performed during the same time period." Adding the additional days together "would [therefore] result in an inaccurate, overly generous estimate of additional work days." The CAB stated that, "[r]ather than adding each of these additional days together," it would

"permit recovery for full crew costs for the longest of the overlapping tasks, that is, twenty days."[4]  The total award for this claim was $97,856.72.  Given the CAB's detailed analysis, we affirm the award for this claim.

*Pepco Manholes Claim* — Rustler claimed $247,726.05 for forty days of delay caused by having to work around Pepco contractors.  The CAB found that Rustler proved only that its work was disrupted by 6.5 days.  Again, we conclude that this decision was supported by substantial evidence.  Although Pepco crews were on site for several months, Rustler produced only eleven daily crew reports for this period, none of which mentioned the extent to which Rustler's work was delayed by Pepco.  To the contrary, the crew reports show that Rustler was able to complete full days of work on every day except one.  The first day Pepco's representatives were on scene, the majority of Rustler's crew worked a half day or

---

[4]  Rustler claims, among other things, that the CAB "ignored" precedent that places the burden of proving concurrent delay on the District.  At oral argument, Rustler appeared to contend that the CAB's decision to limit the number of days it awarded Rustler for this claim because many of its tasks overlapped was an application of the doctrine of concurrent delay.  That assertion is incorrect.  The term "concurrent delay" has a special meaning in government contract law and refers to the delay that "occur[s] when two or more causes have a simultaneous effect on contract performance."  John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, *Administration of Government Contracts* 569 (4th ed. 2006).  In order for a concurrent delay to exist, two parties, usually the government and the contractor, must "simultaneously" contribute to the "period of delay."  *R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 410 (2004) (internal quotation marks omitted).

less. The CAB therefore awarded Rustler a half day for the out-of-sequence work based on the crew reports.

Because the crew reports did not offer enough support for Rustler's claim, Rustler also attempted to rely on letters it sent to the District regarding this issue. We agree with the CAB that the majority of those letters were unpersuasive because they did not provide details supporting the amount of time Rustler claimed to have been delayed. However, the CAB relied on one letter which clearly stated that Rustler was delayed in pouring concrete for six working days because of Pepco's crews. Accordingly, the CAB awarded Rustler $36,155.16 for this claim, which included a total of 6.5 days for disrupted work. We do not disturb this determination.

*Roadway Tie-In Claim* — Rustler claimed $67,999.69 in increased costs for completing the roadway tie-in. The District had previously compensated Rustler for crew costs for the tie-in work, so Rustler sought thirteen days of field overhead and related costs. Because Rustler "failed to prove overall contract delay resulting from the District's defective specifications for the roadway tie-in," the CAB concluded that Rustler "failed to prove its quantum for this claim" and awarded it

nothing. *See Kinetic Builder's Inc.*, 226 F.3d at 1317-18. As discussed in greater detail above, we agree.

*Catch Basin Relocation Claim* — Rustler claimed an equitable adjustment of $160,136.89 which included seven days of crew time, twenty days of field overhead allegedly accrued as a result of the District's delay in issuing instructions on how to proceed in relocating, and $8,550 for unused catch basin lids. The CAB disagreed with Rustler's calculation of damages and awarded Rustler two days of crew time. This determination is well-supported by the record. The daily crew reports Rustler submitted showed that Rustler poured concrete in front of the catch basins on three days, rather than on seven days as Rustler claimed. Those reports further showed that a full crew did not work on pouring concrete each day. Accordingly, we affirm the CAB's decision to award Rustler two days of crew time. As discussed above, Rustler was unable to recover field overhead because it did not prove overall contract delay. The CAB awarded Rustler a total of $21,469.82 for this claim, which included $8,550 for unused catch basin tops.

We reject Rustler's contention, discussed at length during oral argument, that since it proved entitlement, it should receive at the quantum stage all of the damages it requested. The regulations governing the CAB explicitly permit the

CAB to "reserv[e] the determination of the amount of recovery . . . for another proceeding." 27 DCMR § 119.1. The entitlement order itself refutes Rustler's argument, as it did not purport to award any damages. Rather, it remanded the matter "to the parties for a determination of quantum."

Rustler also argues that the CAB should have applied a "lighter evidentiary burden" at the quantum stage. Citing *Civil Construction,* 62 D.C. Reg. at 4443, Rustler argues that it was only required to "prove the amount with sufficient certainty such that the determination of the amount will be more than mere speculation." Rustler is mistaken. While it is true that "a claimant need not prove his damages with absolute certainty or mathematical exactitude," *Blinderman*, 39 Fed. Cl. at 542 (internal quotation marks omitted), this principle does not create a lower burden of proof, *see Mega Constr.*, 29 Fed. Cl. at 444. Instead, the same preponderance of the evidence standard of proof that applies to an entitlement showing "also applies to proof of the amount of [a contractor's] increased costs." *Id.*; *accord, Meridian Eng'g Co. v. United States*, 130 Fed. Cl. 147, 165 (2016) ("[T]he standard used to determine whether the burden of proof has been met is the preponderance of the evidence test.") (internal citation and quotation marks omitted), *rev'd on other grounds*, 885 F.3d 1351 (Fed. Cir. 2018). The CAB correctly applied this standard.

**B. The District's Cross-Petition for Review**

In its cross-petition, the District argues that the CAB's use of the jury verdict method to calculate damages was "unwarranted" for two reasons. First, it contends that because Rustler did not "demonstrate[] a justifiable inability to produce" evidence of its actual costs or cost estimates, the award should be vacated. Second, it argues that the jury verdict method may only be used to resolve conflicting testimony.

We recognize that there is some confusion about the jury verdict method and its application. This court has issued only one opinion on this subject, *see District of Columbia v. Org. for Envtl. Growth, Inc.*, 700 A.2d 185, 203-04 (D.C. 1997) ("*OFEGRO*"), so we first clarify that the term "jury verdict method" covers a variety of techniques which allow contract appeals boards and courts "to fashion a price adjustment that best compensates the contractor yet does not force the government to pay an amount that is unfair in the circumstances." John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, *Administration of Government Contracts* 709 (4th ed. 2006) ("Cibinic & Nash").

There are several cost-calculating techniques that fall under the umbrella of the jury verdict method. *See, e.g.*, *Delco Elecs. Corp. v. United States*, 17 Cl. Ct. 302, 328-33 (1989) (calculating damages by awarding a certain percentage of the contractor's claim); *Freeman Gen., Inc. v. United States*, 918 F.2d 188 (Fed. Cir. 1990) (calculating damages by using the government's cost estimate). The "most common" technique is for the adjudicating body "to make its own detailed computation of the adjustment, based on all of the data provided by the parties." Cibinic & Nash at 710. This is the technique the CAB employed in this case, and its methodology is explained in detail above.

Following federal precedent, we have held that the jury verdict method may be used only when it is determined: "(1) that clear proof of injury exists; (2) that there is no more reliable method of computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of the damages." *OFEGRO*, 700 A.2d at 204 (quoting *WRB Corp. v. United States*, 183 Ct. Cl. 409, 425 (1968)). All three conditions are present here. First, it is undisputed that Rustler was required to perform numerous additional tasks due to differing site conditions and the defective specifications provided by the District. Given the scope of the additional work, it is self-evident that Rustler incurred some amount of extra cost in completing the unplanned tasks. Second, because Rustler

did not break down its costs by task, no more reliable method of proving damages was available. Third, Rustler provided the Board with enough detailed records to allow it to approximate damages in a fair and disciplined manner.

The District does not claim that Rustler failed to satisfy the basic requirements enumerated above. Rather, it primarily argues that the jury verdict method could not be used in this case because Rustler did not demonstrate that it was "justifiably unable[] to provide actual cost data concerning the additional or out-of-sequence work it performed." It bases this argument on language from *OFEGRO* and a Federal Circuit case, *Dawco Construction, Inc. v. United States*, 930 F.2d 872, 880-82 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc).

While *Dawco* is not binding precedent, we think it important to discuss the case in detail, as we often "look . . . to . . . decisions of [the Federal Circuit and the United States Court of Federal Claims]" in government contracts cases. *OFEGRO*, 700 A.2d at 198. In *Dawco*, the Federal Circuit reversed the lower court's use of the jury verdict method, stating that the failure of the contractor to "establish that it could not have identified to an acceptable degree of certainty its . . . costs attributable to the differing site conditions . . . should have precluded the Claims

Court from adopting [the method]." 930 F.2d at 881. The court elaborated that the contractor's inability to give "any justification" for its failure to present precise evidence also should have barred the use of the jury verdict method. *Id.* at 881-82. Our similar comment in *OFEGRO* merely cited to *Dawco* and related federal precedent. 700 A.2d at 204.

The District asserts that under *OFEGRO* and *Dawco*, the CAB is forbidden to award Rustler any damages at all because Rustler did not break down its costs by task and did not justify its failure to do so. We do not read the language in *Dawco* as restrictively as the District does for several reasons. To begin, in *Dawco* it was unclear whether the contractor had incurred any damages. 930 F.2d at 881.[5] The court therefore expressed uncertainty about whether the contractor could even satisfy the first prong of the three-part test for resorting to the jury verdict method. *Id*. Rustler presents a much stronger case than the contractor in *Dawco*.

The *Dawco* court's primary concern about use of the jury verdict method was "the risk that unrealistic assumptions [would] be adopted and extrapolated" that would "greatly multiply[] an award beyond reason." *Id*. at 882. The lower

---

[5] Similarly, in *OFEGRO*, we commented that "[a]ctual cost data are particularly important in this case because the record does not clearly show that an acceleration [of work] took place." 700 A.2d at 204.

court in *Dawco* granted the contractor an equitable adjustment that was more than the original price of the contract, resulting in an award that was "roughly twice as much money for about half [the amount of work]." *Id.* Such concerns are not present here.

In our opinion, an absolute ban on the use of the jury verdict method in cases where a contractor has presented substantial evidence, but fails to present actual costs or cost estimates broken down by task, is contrary to the purpose of equitable adjustments. We therefore hold that a contractor's failure to demonstrate that it was unable to keep better records does not necessarily preclude use of the jury verdict method. However, we do not retreat from our prior statements that the use of the jury verdict method is disfavored. *See OFEGRO*, 700 A.2d at 203-04.

"A contractor must prove its costs using the best evidence available under the circumstances." *Delco*, 17 Cl. Ct. at 321. "Where actual cost data is not available, estimates of the costs may be used." *Id.* Nevertheless:

> When a contractor has proven entitlement, but cannot define his costs with exact data, courts and appeal boards have been reluctant either to send the dispute back to the Contracting Officer for determination of excess costs or to send the contractor away empty handed when it is at all possible to make a fair and reasonable approximation of the extra costs. Under such circumstances, it is not

uncommon to resort to the 'jury verdict' method of determining excess costs.

*Appeal of Lawrence D. Krause*, AGBCA 76-118-4, 82-2 BCA ¶ 16129, 1982 WL 7879 (Nov. 16, 1982). We do not believe this holding will discourage a contractor from keeping appropriate, detailed records. After all, Rustler paid a hefty price for its failure to keep better records.

Finally, we address the District's argument that the CAB may only use the jury verdict method to resolve conflicting testimony. While resolving conflicting testimony may be a common purpose for using the method, it may be employed in other circumstances as well. It may, for example, be used to calculate "the amount of an adjustment when there are gaps in the evidence or the evidence is not completely persuasive," Cibinic & Nash at 707, as was the case here. Indeed, in the same paragraph of *OFEGRO* where we talked about conflicting evidence, this court acknowledged that the jury verdict method "may be used when the board is not convinced by the contractor's evidence of the precise amount owed, yet finds that some extra costs were incurred." 700 A.2d at 203.

**IV. Conclusion**

For the reasons stated, we affirm the CAB's quantum award of $155,481.70, with interest.