# IN THE SUPERIOR COURT OF DELAWARE

| | | |
|---|---|---|
| WANDA ROBERTS, | ) | C.A. No. S21C-10-017 CAK |
| | ) | |
| Plaintiff and | ) | |
| Counter Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOFFA CONSTRUCTION | ) | |
| COMPANY LLC, | ) | |
| | ) | |
| Defendant and | ) | |
| Counter Plaintiff. | ) | |

Submitted: December 13, 2024
Decided: December 20, 2024

## MEMORANDUM OPINION AND ORDER

Gregory A. Morris, Esquire, Ligouri & Morris, 46 The Green, Dover, DE 19901, Attorney for Plaintiff.

Christopher P. Clemson, Esquire, Gordon, Fournaris & Mammarella, P.A., 1925 Lovering Avenue, Wilmington, DE 19806, Attorney for Defendant.

**KARSNITZ, R.J.**

## DECISION AFTER TRIAL

## I.      FACTUAL BACKGROUND[1]

On January 11, 2021, Moffa Construction Company LLC, a Delaware limited liability company, with its principal place of business located at 27027 Avalon Road, Georgetown, Delaware 19947 ("Defendant") prepared and provided to Wanda Roberts, a Delaware resident, with an address of 17046 North Brandt Street, Unit 2121, Lewes, Delaware 19958 ("Plaintiff") a proposal for framing (the "Framing Proposal") Plaintiff's residential property situated at 5 Sloan Road, Harbeson, Delaware 19951 (the "Property"). The Framing Proposal provided for a fixed price of $380,972.60 and provided, in pertinent part, that Defendant was not responsible for performing "electrician, plumbing, [or] HVAC rough-ins." On January 25, 2021, Defendant prepared a revised proposal, which was fully executed by Plaintiff and Defendant on February 16, 2021 (the "Contract") for major construction work (the "Project") at the Property, at a total cost of $450,000. Plaintiff ultimately remitted $360,000 (the "Project Funds") to Defendant under the Contract via three progress

---

[1] In a Pre-Trial Stipulation dated June 25, 2024, the parties mutually agreed to these facts, or such facts were undisputed at trial. In their Pre-Trial Stipulation, the parties contended that the following issues of fact remined to be litigated: whether the parties breached the Contract, and the nature and extent of their damages. The parties also contended that the following issue of law remained to be litigated: whether the parties had valid breach of contract claims against each other.

payments of $100,000, $180,000, and $80,000.

Prior to engaging Defendant, Plaintiff had procured two sets of building plans for the Project, one being a plan drawn by Moonlight Architecture dated October 27, 2020, and the other being a plan prepared by Ability Design Group dated June 20, 2020 (together, the "Plans"). Plaintiff had also obtained a building permit from Sussex County, started the foundation, secured a stonemason and a roofer, started preparing the site for renovation, purchased an appliance package, and ordered four exterior doors. The Contract clarified the scope of work, with specifications, which Defendant was to perform in accordance with the Plans and stated certain items which Defendant was not responsible for performing. Plaintiff purported to act as general contractor for the Project, retaining a large share of the responsibility for the Project, including the obligation to ensure certain contractors were engaged to complete certain phases of the Project. Plaintiff engaged Defendant to perform various general contractor services for the Project which had not been procured by Plaintiff. Defendant contacted various subcontractors and materialmen to provide quotes upon which to price the work requested by Plaintiff.

Defendant commenced demolition, which was completed in March -- April 2021 and commenced framing in May 2021. When framing started, the parties discovered that the Plans were erroneous and inaccurate in certain respects. This would necessitate various repairs to resolve architectural defects in the Plans,

3

accommodate Plaintiff's desires which conflicted with what was shown in the Plans, and remedy work from Plaintiff's previous subcontractors. The Project also experienced the effects of the COVID-19 pandemic in the form of supply chain challenges, labor and material shortages, and increased prices. As a result, framing would not be substantially completed until July -- August 2021. On September 2, 2021, the Project passed a "house wrap inspection," which occurs when the house is fully sealed and prior to the installation of siding. Defendant had placed an order for the siding materials in accordance with the specifications in the Contract, which had a 4–5-week lead time, due to supply chain issues at that time. Plaintiff was frustrated that the siding installation had not occurred due to the lead time in obtaining the siding materials. She asked that the remaining framing punch-list items be completed in the meantime, which was agreeable to Defendant.

On September 22, 2021, Defendant completed these punch-list items, including patching nail holes required by Roberts' roofer, who was scheduled to arrive on-site later that week to perform its contracted work. That afternoon, Plaintiff, Defendant and others met at the Property to discuss the framing of the fireplaces which Plaintiff intended on procuring. During that meeting, Plaintiff and Defendant discussed the status of the delivery of the siding materials, which had not yet arrived. Plaintiff also asked Defendant to install a well on the Property, but Defendant pointed out that HVAC rough-ins, which had not yet been done, were a

4

prerequisite to installing a well. Defendant left what was described as a "heated" meeting and Plaintiff asserts that this is when he "walked off the job."

The next day, September 23, 2021, Defendant informed Plaintiff that on September 24, 2012, he would be on-site to work on the front porch, and that he would prepare a change order invoice which included the various additional framing costs which were previously incurred due to deviations from the Plans and Contract specifications, and which were authorized by Plaintiff (the "Change Order"). Plaintiff responded by requesting Defendant to ensure that the siding specifications were double-checked and to call two other material suppliers who could deliver the siding materials by October 10-15, 2021. Defendant replied that the siding specifications which Plaintiff expected deviated from the specifications in the Contract and thus the order would need to be updated. Defendant offered to call his siding supplier the following day to see if he could update the order. The discrepancy had to do with the color of the fascia in the Contract vs. the color which Plaintiff now desired. Plaintiff asked Defendant to resend the Change Order. Defendant suggested that it would be best for the parties to settle on the Change Order and to write up a release of Contract so that Plaintiff could finish the project as she saw fit. Plaintiff ignored Defendant's suggestion and responded later that evening to request that Defendant resend the revised Change Order, which he did. The following morning, Defendant informed Plaintiff that he was successful in updating the siding

5

order, but Plaintiff did not respond.

On September 27, 2021, Defendant asked Plaintiff to meet him at the Property on September 30, 2021, since he could not return to work until then due to bronchitis, an assertion that Plaintiff testified she thought was untruthful. Instead, Plaintiff revived Defendant's suggestion to settle the Change Order and release Defendant from the Contract, and she requested that Defendant send her a release and advise how much money was being returned to her. Defendant agreed to complete the framing and install the siding (since it was already ordered), and asked Plaintiff to clarify her request that money be returned. Defendant stated to Plaintiff that no money would be returned due to the costs of the Project, including the framing extras on the Change Order, that had accrued to that point in time, and he asserted that the Project costs were "just about even." Defendant prepared, signed and sent to Plaintiff a termination agreement, but Plaintiff neither responded to nor signed the termination agreement. Defendant then had his legal counsel prepare another termination agreement. On September 29, 2021, Defendant revoked the first termination agreement, notifying Plaintiff that another termination agreement with the terms of cancellation and a settlement would be sent to her by his attorney. Defendant, through his counsel, was thereafter unsuccessful in contacting Plaintiff to further negotiate the termination.

Defendant never returned to the Property or performed any additional work at

the Property, for fear that Plaintiff would initiate legal action against him, for trespass or otherwise. Plaintiff confirmed that she would not have allowed Defendant back on the Property.[2]

## II.   PROCEDURAL BACKGROUND

On October 15, 2021, Plaintiff filed a Complaint against Defendant for breach of contract, alleging that, despite her making timely payments under the Contract, Defendant failed to complete construction in accordance with the contract. She sought damages of $220,000 for the cost to complete construction, plus costs and post judgment interest. On January 4, 2022, Defendant filed its Answer to the Complaint positing nine affirmative defenses and a counterclaim against Plaintiff for breach of contract. In the counterclaim, Defendant sought from Plaintiff (i) compensatory damages in the amount of $13,196.90, (ii) expectation damages in an amount of the $90,000.00 it had not yet been paid, (iii) attorneys' fees and costs, and (iv) post-judgment interest.

After depositions, a jury trial was scheduled for November 6, 2023, but on November 3, 2023, the parties requested a thirty-day continuance to pursue and finalize settlement of the case, which I granted.  Settlement negotiations were

---

[2] In the meantime, Plaintiff had engaged Megee Plumbing & Heating Co., Inc as the HVAC contractor to perform, among other work, HVAC rough-ins, and had signed a contract with G. Fedale Roofing and Siding to supply materials and labor to complete the siding work under the Contract.

ultimately unsuccessful. This is unfortunate because litigation put the outcome of the dispute outside the control of the parties and resulted in the time and costs attendant to a full trial.

On November 16, 2023, Defendant filed a Motion to Enforce Settlement Agreement. Plaintiff filed a Response to this Motion on January 4, 2024, and, after oral argument on January 31, 2024, I denied the Motion on February 6, 2024. On July 22, 2024, the parties agreed to a bench trial, which was held on August 5, 6, 7, and 8, 2024 before me and Judge Kathleen Vavala. Plaintiff called Wanda Roberts, Dennis Crichlow, and Matthew Moffa, principal of Defendant ("Moffa"), as fact witnesses, and David Bekus as an expert witness. Defendant called Moffa and Marcos DeMiranda as fact witnesses, and J. Frank Peter as an expert witness.

I put my preliminary thoughts on the record from the bench on August 8, 2024, when I stated that, in my view, there was a mutual termination of the Contract.[3] This narrowed the factual issues to what work Defendant had completed and the value of such work compared to the amount that Plaintiff paid to Defendant ($360,000) at the time of termination. I gave the parties time to file post-trial briefs before rendering a decision, the deadline for which was extended several times. Plaintiff and Defendant filed their post-trial briefs on December 13, 2024.

---

[3] In their post-trial briefs, notwithstanding my statement from the bench, the parties made a number of alternative legal and factual arguments. As discussed below, however, I remain of the view that the Contract was mutually terminated.

This is my decision after trial.

## III.  LEGAL STANDARDS

### A. Breach of Contract

To prevail on a breach of contract claim, the party asserting breach must prove by a preponderance of the evidence (i) the existence of a contract, whether express or implied; (ii) the breach of an obligation imposed by the contract; and (iii) resultant damage to the plaintiff. A breach is material if the failure is "so fundamental to a contract that the failure…defeats the essential purpose of the contract or makes it impossible for the other party to perform the contract."[4] Delaware courts have adopted the factors set forth in the Restatement of Contracts to consider the materiality of a breach, including: "(a) the extent to which the injured party will be deprived of the benefit of which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith

---

[4] *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253 (Del. Super. Nov. 28, 2011).

and fair dealing."[5]

## B. Credibility of Witnesses

The trial of this case elicited widely divergent testimony and other evidence from Plaintiff and Defendant, and thus called on me as the trier of fact to weigh the parties' credibility. I am to "judge the believability of each witness and determine the weight given to all trial testimony….consider[ing] each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness and unreasonableness of the testimony, the motives actuating the witness; the fact, if it was a fact, the testimony was contradicted; any bias, prejudice, or interest, manner or demeanor upon the witness stand and all other facts and circumstances,"[6] and the witness's interest in the outcome of the litigation.[7] "In circumstances of doubt, the court must make credibility determinations based on the testimony and evidence submitted to make up the record and the patterns of behavior reflected in the testimony and evidence."[8]

## IV.  ANALYSIS

The key fact in dispute is whether the parties mutually parted ways with respect to further work under the Contract, or whether Defendant walked off the job.

---

[5] Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981).
[6] *Commonwealth Construction Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916 (Del. Super. Aug. 31, 2006).
[7] *Phillips v. Siano*, 2000 WL 33115824, at *2 (Del. Super. Sept. 26, 2000).
[8] *Foraker v. Voshell*, 2022 WL 2452396, at *34 (Del. Super. July 1, 2022).

I reject Plaintiff's claim that Defendant walked off the job. I find Defendant's testimony on this issue more credible and reject Plaintiff's testimony on this issue. In her emails, Plaintiff herself acknowledged that the Contract was mutually terminated. In my eyes, her credibility was negatively affected by her myriad purely speculative claims, by questioning a delay caused by Defendant's bronchitis, and by questioning the legitimate use of her payments by Defendant. On the other hand, Defendant's testimony is consistent with the other evidence, especially the text messages which show unequivocally that Defendant wanted to continue the Project. I also give credence to Defendant's testimony that he wanted to stay on the job because he found it interesting and challenging. Defendant's credibility was negatively affected, however, by submitting invoices that clearly were not chargeable to Plaintiff and were in fact for another project, discussed further below.

It is true that Delaware law recognizes that abandonment of a contract is a material breach.[9] A finding of abandonment is possible where a contractor "left the job and gave no indication that he would return to finish the outstanding work."[10] However, such is not the case here. Defendant did not refuse to work pending a payment draw (*Carey*) or maintain a prolonged silence with Plaintiff (*Schute*). Rather, he offered to return in a few days to continue work. Indeed, Plaintiff initially

---

[9] *Smith v. Mattia*, 2010 WL 412030, at *4 n.32 (Del. Ch. Feb 1, 2010); *Lee-Scott v. Schute*, 2017 WL 1201158 (Del. Ct. Com. Pl. Jan 30, 2017).
[10] *Carey v. Estate of Myers*, 2015 WL 4087056, at *2-3 (Del. Super. July 1, 2015).

11

rebuffed Defendant's offer to terminate the Contract. She then revived the offer to terminate and even then, Defendant offered to finish some outstanding work.

My opinion is that the parties ultimately reached a mutual agreement to terminate the Contract. I find that the Contract was not improperly terminated by either party, but rather that the termination was mutual in nature, akin to a termination for convenience, despite the Contract's lack of any express termination provision.[11]

This finding affects Plaintiff's legal entitlement to recover her subsequent costs to complete the work. As more fully analyzed below, when Plaintiff agreed to terminate the Contract, she assumed the responsibility to continue the project as she saw fit, at a higher or lower cost, or to change the scope of the project, and Defendant is not liable therefor. The analysis of Plaintiff's expert witness, Mr. Bekus, on "cost to complete" thus becomes irrelevant. This is not a criticism of Mr. Bekus; I found him credible. However, Plaintiff did not give up her claim to any amount by which her $360,000 payment might exceed the value of pre-termination work done by Defendant.

By the same token, this means that Defendant lost any legal right to claim $90,000 in expectation damages, and I reject that claim. However, Defendant

---

[11] *Delaware Financial Management Corp. v. Vickers*, 1999 WL 458633 (Del. Super. June 9, 1999) (discussing that Delaware follows the general rule that "a contract for services without a termination provision is terminable at will.").

retained its claims for the value of any unpaid pre-termination work. This calls into play Defendant's documentary evidence on the value of his pre-termination work and the analysis of Defendant's expert witness, Mr. Peter, on the value of the work provided by Defendant prior to termination of the Contract.

## V. DAMAGES

### A. Measure of Damages

This requires a comparison of what Plaintiff paid ($360,000) to Defendant under the Contract vs. the value of the work Defendant completed before the Contract was mutually terminated. Defendant presented into evidence an expense worksheet showing its actual costs in performing the Project, which includes documentary back-up supporting these costs. There is no evidence suggesting that these costs are fabricated, inaccurate, and not the actual dollars invested into the Project. To the extent that it does not or is unclear, Defendant's credibility warrants such a finding. The total cost, plus Defendant's margin (or mark-up), as stated and documented in the worksheet and supporting documents is $358,000.

In her post-trial brief, Plaintiff requests that I measure the value of Defendant's work based on the percentage of work completed at the time of mutual termination in relation to the overall contract price. This approach fails to account for Defendant's actual costs and the realities of the Project. Construction projects often involve front-loaded costs, such as purchasing materials and mobilizing labor.

The contractor may incur a disproportionate amount of expense before reaching milestones aligned with proportional completion. A proportional approach also overlooks the costs of various deviations, changing market conditions, and opportunities where a contractor can perform labor at his own cost. An approach based on actual costs ensures a fair, objective assessment of the Project which prevents any circumstances of unjust enrichment of one party over the other. This concept is consistent with the underlying rationale of termination for convenience clauses, more frequently used in the governmental contracting context.[12]

Plaintiff cannot argue that this gives license to Defendant to go over budget with impunity and thus unjustly enrich itself, because it is reasonable for that burden to transfer to Plaintiff upon their mutual termination of the Contract. Plaintiff should be deemed to have made a conscious decision to complete the project herself, at her own cost, under then-current market conditions.

Plaintiff also points out that cost estimates by Defendant for various phases of the Project during depositions vary from the actual costs proffered at trial. Any rough estimates given by Defendant during depositions of costs for certain phases of the

---

[12] *District of Columbia v. Org. for Envtl. Growth*, 700 A.2d 185, 188 (D.C. 1997) ("In practical effect, a termination for convenience converts a fixed-price contract into a cost-reimbursement contract for the work performed up to the effective date of the termination. Allowable costs incurred, plus profit, will be recovered, subject to the overall limitation of the contract price and the possible application of any loss adjustment provisions. The contractor's recovery is thus measured by the costs incurred rather than the value of the performance to the government.").

Project which proved to be inaccurate were clarified by the actual evidence at trial. Construction pricing is volatile and costs of various phases of construction were subject to market conditions at the time applicable contractors were engaged and the work performed. In short, the most reliable method of calculation of the value of the work performed by Defendant should be Defendant's actual cost, supported with proven documentary invoices, rather than an unproven, speculative estimates.

I find that Defendant spent a total of $358,000. A charge for Defendant's labor is legitimate, even if Defendant was also paid a salary by his company. If he did the work, he incurred the cost of his time.

However, the parties identified at trial that certain invoices from Carter Machinery which applied to a different project totaling $8,000 were mistakenly included in the calculation and should be removed. As a result of said correction, I deduct $8,000 for these invoices which Defendant improperly submitted to Plaintiff. This leaves $350,000, consisting mostly of raw material costs.

In my opinion the Change Order that Defendant presented to Plaintiff is enforceable. The evidence showed that work authorized and performed outside of a contract's specified terms is neither uncommon, nor does it preclude the contractor's ability to be compensated for such work in every instance. Delaware courts have consistently recognized that contracts can be modified by the parties' conduct, where such actions demonstrate a mutual intention to alter the terms of the original

contract.[13]

In this case the Contract required that change orders be in writing. However, Delaware law provides that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision.[14] This is frequently applied in the context of change orders.[15] The evidence demonstrates that the parties' course of conduct often involved directives both on and off-site to Defendant by Plaintiff to perform work which deviated from the Plans and Contract specifications, and which required the procurement of additional materials and labor. Each line item was requested by Plaintiff, constituted a deviation from the Plans or specifications in the Contract, and was authorized by Plaintiff.

The Change Order includes a line item for material price increases due to inflation. These provisions are common and enforceable, and attacks on such provisions are frequently unsuccessful.[16] Plaintiff conceded at trial that Defendant had the right to charge these material increases. The trial testimony further evidenced a pattern of conduct that these increases were communicated to Plaintiff both prior to and after formation of the Contract. These price increases are consistent with Mr.

---

[13] *Good v. Moyer*, 2012 WL 4857367, at *6 (Del. Super. Oct. 10, 2012).
[14] *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000); *Daystar Sills, Inc. v. Anchor Investments, Inc.*, 2007 WL 1098129, at *4 (Del. Super. Apr. 12, 2017).
[15] *Creative Builders v. Jackson*, 2000 WL 33654094, at *14, (Del. Ct. Com. Pl. Aug. 10, 2000).
[16] *Carey's Home Constr., LLC v. Est. of Myers*, 2014 WL 1724835, at *6 (Del. Super. Apr. 16, 2014).

Bekus's testimony that lumber prices "went through the roof" during the Project.

To the extent there exists a conflict in testimony between Plaintiff and Defendant as to the Change Order work performed or the authorization thereof, I find Defendant's testimony more credible. Plaintiff understood not only that Defendant expected to be paid, but also that the Change Order would be forthcoming. To prevent recovery by Defendant would unjustly enrich Plaintiff.

Moreover, Delaware law permits Defendant to recover the value of the work performed in the Change Order under the theory of *quantum meruit*. "A *quantum meruit* claim permits a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid."[17] "In construction litigation, *quantum meruit* is a well-known, and even preferred remedy…by which a plaintiff, in the absence of an express agreement, can recover the reasonable value of the materials or services it rendered to the defendant."[18] Delaware courts often employ a *quantum meruit* analysis "to parse change orders in construction litigation, where the facts establish that the parties waived the contractual provision governing such modifications."[19]

---

[17] *Gone GB Ltd. v. Intel Servs. Div., LLC,* 2022 WL 17494811, at *19-20 (Del. Super. Dec. 8, 2022) (internal quotations omitted).

[18] *Foraker v. Voshell*, 2022 WL 2452396, at *13 (Del. Super. July 1, 2022).

[19] *Id*. (citing *Daystar Sills, Inc. v. Anchor Investments, Inc*., 2007 WL 1098129, at *4 (Del. Super. Apr. 12, 2017)).

Under *quantum meruit*, Defendant is entitled to the reasonable value of the work specified in the Change Order. The Change Order values the work outlined therein in the sum of $39,550.00. In addition, Defendant has the right to claim a markup on the Change Orders, since the Change Orders are not add-ons to the Contract, but rather parts of the Contract. The face value of this 20% markup is $7,900. In my view, Plaintiff's objections to the amount of this percentage are speculative and without sufficient evidence.

Adding Defendant's reasonable Change Order mark-up of $7,900, this brings the total amount spent by Defendant to $357,900.

Since Plaintiff has already paid Defendant $360,000, Defendant owes Plaintiff for her overpayment of $2,100.

## B. Attorneys' Fees and Costs

Defendant has requested that it be awarded its attorneys' fees and costs incurred in defending this action. Delaware follows the American Rule, which provides that each side pays its own attorneys' fees and costs. There are exceptions to the rule, however, including a bad faith exception. "[A]lthough there is no single definition of bad faith conduct, courts have found bad faith where partiers have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims."[20] In my view, Plaintiff's assertions and litigation conduct

---

[20] *Johnson v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

are not so frivolous as to rise to the level of bad faith. Therefore, I deny Defendant's request.

## VI.  AMENDMENT OF PLEADINGS

Defendant requests that I order that the pleadings be amended to the extent necessary or appropriate to address the issues and evidence not raised in the pleadings but presented at trial.[21] Defendant argues that amendment of the pleadings is necessary to cause them to conform to the evidence. Defendant further argues that the Rule is "designed to cure the situation where the course of the trial departs so materially from the image of the controversy pictured in the pleadings or by the discovery process that it becomes necessary to adjust the pleadings to reflect the case as it actually was litigated in the courtroom."[22]

However, Rule 15(b) itself provides that, when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings, and Delaware courts have held that failure to amend the pleadings does not affect the result of the trial of these issues.[23]

In my view, there is not such a material gulf between the issues and evidence in the pleadings and discovery and the issues and evidence at trial as to warrant an

---

[21] Such a motion may be made by any party at any time, even after judgment, under Super. Ct. Civ. R. 15(b).
[22] *In re Mindbody, Inc.*, 2023 WL 2518149, at *103 (Del. Ch. Mar. 15, 2023) (citations omitted).
[23] *Homf II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *123 (Del. Ch. May 19, 2020).

amendment of the pleadings. Therefore, I deny Defendant's request.

## VII. CONCLUSION

For the reasons discussed above, I find that Defendant owes Plaintiff the sum of $2,100, plus interest at the judgment rate,[24] from September 22, 2021until the date of satisfaction.

The parties shall submit to me a form of Order consistent with this Opinion.

**IT IS SO ORDERED.**

/s/ Craig A. Karsnitz

cc: Prothonotary

---

[24] Under 6 *Del. C.* § 2301(a).